OTTO SEIDNER, INC. *vs.* RALSTON PURINA COMPANY.

MARCH 2, 1942.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J. This cause was begun by a bill of complaint, filed by a corporation owning a lot of land and a building thereon, in a predominantly heavy industrial section of the town of Westerly in this state, and carrying on there the business of manufacturing mayonnaise dressing and some similar products. The complainant prays for a permanent injunction to prevent the respondent, lessee of certain land adjoining or near by the land of the complainant, from erecting on this leased land a coalyard or other structure in the nature of a coalyard, and for general relief.

The complainant alleges in its bill, in substance and effect, that the real estate of both parties is, by the zoning ordinance of Westerly, included in a district defined as industrial district B and that by that ordinance the business of conducting a coalyard is excluded and prohibited in that district; that on March 15, 1940, the building inspector of the town, in violation of law, issued to the respondent a building permit to construct a coalyard on its leased land; that the respondent threatens and intends to erect a coalyard thereon; and that the construction and maintenance of such coalyard would, by virtue of P. L. 1922, chap. 2299, as amended, be a nuisance.

. This chapter 2299 is the statute under and in accordance with which the town council of Westerly passed its first zoning ordinance, which remains in force except as validly modified since its passage. This statute was amended by P. L. 1925, chap. 746, which did not amend any part of the original act that authorizes judicial action restraining, as a nuisance, a violation of the zoning ordinance of the town.

The complainant also alleges that its business is very susceptible to dust such as arises from the operation of a coalyard; that such operation, under the aforesaid permit, would greatly interfere with, and make impossible the conduct of that business, so that the complainant would suffer irreparable damage and be compelled to remove its business to some other location; and that therefore such operation would constitute a nuisance to the complainant.

In its answer the respondent, in substance, denies that the business of conducting a coalyard is, by the zoning ordinance of the town of Westerly, as validly enacted, forbidden in the industrial district in which the properties of both parties are situated. It alleges, on various grounds set forth, that the amendment which the town council of that town, on August 7, 1939, made to its zoning ordinance and by which it purported to create, out of a part of the industrial district where a coalyard was a permitted use, a new industrial B district, including the properties of both parties, and to make a coalyard an unpermitted use in that new district, is illegal and void. Therefore it denies the allegation in the bill that the construction and maintenance of a coalyard on the respondent's leased land would, under the statute above mentioned, be a nuisance.

The respondent in its answer also alleges, on grounds set forth therein, that the building inspector's permit described in the bill was issued to the respondent but was not in violation of law. It neither admits nor denies, but puts the complainant upon proof of the allegations in the bill as to the nature of the complainant's business and its susceptibility to dust such as arises from the operation of a coalyard, and as to the effect which the operation of a coalyard by the respondent under the aforesaid permit would have upon the conduct of the complainant's business in its present location in Westerly.

The cause was heard before a justice of the superior court on bill, answer and replication, and at the hearing considerable testimony was introduced by each party and some documentary evidence also was introduced. After the hearing, this justice, whom we shall hereinafter refer to as the trial justice, filed a decision, in which he discussed at considerable length the evidence introduced and drew certain conclusions therefrom.

He refused to grant relief to the complainant upon any of the grounds set forth in its bill of complaint which were based upon the amended zoning ordinance of Westerly and

the statute above referred to. However, at the end of his decision, he sustained the last ground for relief relied upon by the complainant, and stated that he was convinced that the operation of the coalbins, which the respondent intended to erect and operate under the permit issued to it by the building inspector of the town, "will deleteriously and effectively damage complainant's property and its business" and constitute a private nuisance. He therefore granted the complainant's prayer for an injunction.

Later a decree was entered, by which the respondent was permanently enjoined from making any use of the building permit, above described, authorizing it to construct a coalyard on the land leased to it, and from constructing and maintaining any coalyard or coalbins on that land. The cause is now before us on the respondent's appeal from that decree, the substantial grounds of appeal stated being that the decree is contrary to the law; that it is contrary to the evidence; that the decision is contrary to the law and the evidence, and especially so in the finding that the operation of the proposed coalbins will irreparably damage the complainant's property and business and constitute a private nuisance.

At the hearing in the superior court the following facts were shown by undisputed evidence. The complainant's building is of brick, measuring about 150 feet, east and west, by 62 feet, north and south. Near the easterly end of this building there is a large mixing room containing large vats and mixing machines. There are also other rooms in the building, for the storage of glass jars, bottles and other containers and materials for the making of mayonnaise and similar food products, in which the complainant specializes, and for the storage of the finished products until they are shipped out. These are either white or in light shades and are sold in transparent glass containers. It is necessary for marketing them that they be free from any foreign substances perceptible to either taste or sight. Any such specks

or discoloration caused by coal dust would vitally affect their salability.

To the west of this building and twelve feet distant from it is the respondent's building, in which for five years or so it has been conducting a business of selling grain, hay and other food products for horses and cattle. Running, in a general westerly direction, close by the north sides of the two buildings of the parties, and curving to the left, there is a spur track of the New York, New Haven & Hartford Railroad Company. This spur track ends at the westerly end of the respondent's building.

On the north side of the complainant's mixing room there are a window and a door, which open upon a platform for the loading of the complainant's products into freight cars on the spur track. The distance from this window to the nearer rail of the track is eleven feet. The room next west of the mixing room is used for the storage of supplies, and the north side of it is very close to the spur track. It has sliding doors through which supplies are delivered from time to time from a freight car standing on the track.

The respondent wishes to add to its business that of selling anthracite coal. For that purpose it has secured by lease a rather small parcel of land, which is situated on the north side of the railroad spur track and directly across that track, from the respondent's building on the south side, and is bounded on the northwest by a public street known as Industrial Drive. From the level space where the spur track and the buildings of the parties are located, the ground slopes down steeply, for some distance, 25 to 30 feet according to a witness for the complainant; and at the foot of this slope the respondent plans to erect a wooden building or coalpocket which would contain three coalbins for the storage and sale of pea, chestnut and stove anthracite coal.

On April 5, 1939, it filed with the building inspector upon whom, under a provision of the zoning ordinance of Westerly, is imposed the duty of enforcing its zoning ordinance, an application for a permit to build such a coalpocket, and

he referred this application to the zoning board. On April 26, it came on for hearing before that board, and, although a coalyard or coalpocket was then, under the zoning ordinance, a permitted use in the industrial district in which the land was then located, the board denied the application, on the ground that in its opinion the erection of coalbins "would be detrimental to the public health and welfare of the community."

On a writ of *certiorari,* issued by this court on a petition by the respondent, the record of the proceedings before the board was certified to this court for review; and, upon hearing, the decision of that board was reversed for the reason that the board had no discretionary power to deny the application on the above ground or on any ground based on the ordinance in the form in which it was then before us. *Ralston Purina Co.* v. *Zoning Board,* 64 R. I. 197, 12 A. 2d 219.

At the hearing in that case it was argued that after the matter had reached this court the town council of Westerly had made such an amendment to the zoning ordinance as to make the operation of a coalyard or coalbins on the petitioner's lot in question no longer a permitted use, this being evidently the same amendment on which the complainant in the instant cause is now relying in support of its bill of complaint. As this alleged amendment was not in the record before us, we did not consider it in arriving at our conclusion.

Our opinion was handed down on March 6, 1940; and on March 15, 1940 a permit, signed both by the zoning inspector and by the building inspector, was issued to the respondent in the instant cause granting it permission "to erect a coal storage bin, size 28'-6" by 32'-0" located on the easterly side Industrial Drive, as per application filed April 5, 1939". On this permit the following is typewritten: "The Zoning Board having on the 26th day of April, 1939, voted to deny application for the within permit, and the Supreme Court of the State of Rhode Island, on the 6th day of March,

1940, having handed down its decision reversing the vote of the Board denying said application. Now therefore, this permit is issued as of April 26, 1939, in accordance with said decision of the Supreme Court."

No appeal to the zoning board was taken from the issuance of this permit; and, so far as appears, no action was taken by that board, nor was any action by it sought by anybody, to have this permit vacated on the ground that it was contrary to the zoning ordinance as amended or as alleged to have been amended by the town council. Nor was any action taken by the town council, through the town solicitor, or by the town solicitor, on the ground that erecting coalbins in accordance with the permit and operating them would be in violation of such amended ordinance, to prevent the respondent from doing so.

The distance from the nearest point of the respondent's proposed coalbins to the nearest point of the complainant's building would be 75 feet. If a coal car of standard length were in front of the respondent's main building, with one end of it at the termination of the spur track, the other end of the car would be 28 feet from the window in the west side of the northwest room in the complainant's building, which is the room used for storage of supplies, including the jars for mayonnaise and other products of the complainant. In the north side of that room there is no window. The rooms for mixing the mayonnaise and other dressings and for filling the jars would be farther away from the coalbins than that storage room; and on the north side of the building there is no window farther to the west than the above-mentioned window of the mixing room.

The location where the respondent plans to erect its coalpocket, at the foot of the above-mentioned steep slope down to the north, would be apparently just about directly down that slope from the middle of a coal car, if stopped at the end of the spur track. This coalpocket would be of wood, with a corrugated metal roof and three bins, each with a sloping bottom, of corrugated metal and supported by

wooden posts set in cement. The building would be tightly sealed.

The coal would be brought in an open car, which would be stopped at the end of the spur track. In the bottom of the car would be two hoppers, one nearer one end and the other nearer the other end of the car. When the time would come for discharging the coal from one end of the car into the coalpocket, an open-top receiving box, about five feet square and two feet high and with a bottom sloping down somewhat towards the north, would be placed under the hopper. At the north side of the box would be a closed-top chute two feet square and about twenty-five feet long, into which the box would open and which would itself, at the lower end, to the north, empty into the coalpocket.

The box and the chute would be of wood lined with metal so that the coal would slide along to the pocket and dust would not get outside. A canvas cover, "to keep down any dust", would be placed at the side of the car and around the space below the bottom of the car and above the sides of the receiving box, to which it would be attached all the way' around, in a manner not clearly explained by the respondent's witness who testified as to the manner in which coal would be discharged from the car into the bins. Then the hopper below the bottom of the car would be opened and the coal would drop from the car through the hopper into the receiving box. From that it would pass by gravity into the chute and down that into one of the coalbins in the coalpocket.

When any coal would be sold by the respondent, it would be delivered in trucks, which would come in from Industrial Drive, and it would pass out of a bin through a chute, with a screen in the bottom, and then through a spout. Any screenings would pass into an inclosed housing under the bins.

The witness who testified to all this testified also that such a plan for discharging coal into bins, except that no canvas was employed, had been in use for a considerable

period of time by the respondent at its coalpocket in Putnam, Connecticut; that he had seen it used many times and had watched it very closely; and that there was no appreciable dust in the operation, though there might be a little, "very slight". He also testified that in Putnam the dust would rise in the bin, but it settled therein and he had never seen any dust flying around the yard, though he had watched it many times. This was the nearest to testimony based on actual operation by the respondent of the coalpocket, now only proposed, and it was not contradicted.

The rest of the evidence with regard to dust getting into the air from the operation of the respondent's coalpocket, in the manner proposed by the respondent, which operation would include the unloading of coal from cars, and with regard to such dust being carried into the complainant's plant, if the wind should blow in that direction, from the west, and with regard to any damage that would result from such dust to the complainant's products, was entirely opinion evidence and very conflicting. In particular there was no evidence as to the probable frequency and duration of such westerly winds in that locality.

Nor was there any evidence that the respondent proposed to unload coal at times when the wind was blowing with some force toward complainant's plant, or when operations in said plant would be going on. Nor was there any clear evidence that any dust resulting from the respondent's proposed method of operation would not only reach, but would get into the complainant's mixing room, which is at or near the northeasterly corner of its building, or would get into the room where its empty bottles and jars are stored, so that they would have to be washed by hand at considerable expense; and, according to evidence for the complainant, the windows in its plant are kept shut during six months of each year.

In his decision the trial justice reviewed the facts as to the application by the respondent for a permit to erect and operate a coalyard on its leased premises, the decision of the

zoning board denying such application, the reversal by this court of that decision, the action of the town council in amending the zoning ordinance, and the later issuance of such permit on March 15, 1940, "as of April 26, 1939", the date of the previous refusal to issue such a permit. He found that under the circumstances this permit was valid, notwithstanding the amendment passed by the town council. He therefore overruled the complainant's first contention, based on the alleged invalidity of the permit.

The complainant's second contention, *viz.*, that a building which was constructed in violation of the amended zoning ordinance would therefore be a nuisance *per se*, which the complainant, under the statute authorizing the Westerly zoning ordinance, would be entitled to have enjoined by the superior or supreme court, he overruled on the ground that, even if the erection of coalbins by the respondent would be a nuisance *per se* under that statute, such a nuisance would not on that account be a ground for an injunction in the instant cause, since it is clear from that statute that the only remedy thereunder would be in proceedings instituted by the town solicitor.

On the question whether what the respondent proposed to do by erecting and operating coalbins would be a private nuisance to the complainant, by reason of the damage which it would cause to the complainant's business, the trial justice discussed at considerable length the testimony of a witness for the complainant, who for some years had been engaged in the business of marketing coal on a large scale and who had testified that he did not believe that it was "possible to handle or operate a coalyard without creating at certain times more or less dust", and that, if a coalbin was operated at the place where the respondent proposed to operate one, and the coal was unloaded from cars on the spur track above, and the wind was blowing toward the Seidner plant, he did not "see how you could possibly prevent a certain amount of that coal dust penetrating into this place."

·The justice also said that this witness testified as above stated before he was informed how the respondent proposed to unload its coal; and that after he was given such information, he testified that while in his opinion this would minimize the escape of dust, he could not see how *"you could possibly* prevent a certain amount of that coal dust penetrating into" Seidner's plant. This is a substantially correct statement of testimony by this witness, except that, according to the transcript of the testimony, the furthest that he went, after being given the information above mentioned, was to say that, if the wind was blowing in the direction of the Seidner plant and the coal was dry, he did not see how dust could be prevented from "reaching" that plant.

The trial justice also called attention to another witness for the complainant, who had testified that in his opinion, if the unloading of coal was handled as the respondent's witness had testified, "there would be dust but no appreciable amount of dust" and that, "unless there was a very high wind", it would not be carried beyond one hundred feet from the hopper. The trial justice said that the vital question was whether the special equipment which respondent was going to use "will effectively arrest the coal dust so that none of it will escape and by force of uncontrollable elements enter complainant's building"; and that he seriously doubted "that it will accomplish the results claimed for it." He also stated that he was "satisfied that even with the canvas covering, coal dust of appreciable density and quality will escape, which, carried by a westerly wind, will be blown into complainant's plant and especially into the mixing room, working great havoc to the food products, both completed and in process." He further stated: "The coal dust will also settle into and onto the glassware, making necessary a hand-washing, the cost of which, as opposed to machine washing, would put complainant in the dilemma where it could not hope successfully to cope with competition." He added: "Irreparable injury to complainant must certainly follow."

As a result of his consideration of the evidence, he stated that he was convinced that the operation of the coalbins, with or without the proposed equipment, would "deleteriously and effectively interfere with and irreparably damage complainant's property and its business", and would constitute a private nuisance. He then stated: "We are therefore of the opinion that complainant with its large investment and long and well established business is entitled to protection against the damage which we are convinced complainant will suffer by reason of the operation by respondent of the proposed coalbins." It was for the reasons thus stated by him that he granted the complainant's prayer for an injunction.

There may be a serious question whether the complainant, having taken no affirmative action to preserve such right, has a right to contend in this court, as it has done, that even if the trial justice was wrong in finding it to be entitled to have its prayer for an injunction granted on the last ground set forth in its bill, the final decree should be affirmed on either of the first two grounds set forth in the bill, both of which grounds were overruled by the trial justice. But the respondent's counsel has not contended before us that the complainant has no such right and we have thought it best to consider first the merits of these two grounds.

In the above-mentioned zoning act for Westerly, amended as above stated, only one method is provided whereby a property owner in that town whose interests are adversely affected by the issuance of a permit by the building inspector of that town under its zoning ordinance can raise the question of the validity of such permit. That method is by taking an appeal to the zoning board.

The complainant did not, so far as appears in the evidence in this cause, take any appeal from the issuance of the permit under which the respondent is planning to construct and operate a coalpocket on the lot of land leased by it. Therefore we are of the opinion that there is no merit in the first ground upon which the complainant has based its

asserted right to an injunction in this cause. We therefore would reach the same result, as to this ground, as was reached by the trial justice, though in a different manner.

We come then to the second ground relied upon by the complainant, namely, that the construction and maintenance of a coalyard, at the location where the respondent proposes to construct and maintain one, would be in violation of the zoning ordinance of Westerly, as amended, and would therefore be a nuisance which the complainant is entitled, under the zoning act for Westerly, as amended, to have enjoined in this suit.

All that that act, as amended, does, with reference to the enjoining of such a violation of the ordinance, is to provide, in sec. 3, that the *town council* "may also cause suit to be brought in the supreme or superior court in the name of said town to restrain the violation of, or to compel compliance with, the provisions of any such ordinance"; and to provide, in sec. 4, that: "The supreme court and the superior court, within their respective jurisdictions, or any justice of either of said courts in vacation, shall, upon due proceedings *in the name of said town instituted by its town solicitor,* have power to issue any extraordinary writs or to proceed according to the course of equity or both: To restrain the erection, alteration or use of any building, structure or other thing erected, altered or used in violation of the provisions of any ordinance enacted under the authority of this act, and to order its removal or abatement as a nuisance"; and to exercise certain other powers not pertinent to this cause. (italics ours)

It is to be noticed that in this section a violation of the ordinance is not defined even as a *public* nuisance and certainly is not defined as a *private* nuisance; and authority is given to the courts to act only in proceedings brought in the name of the town by its town solicitor. It is clear to us that this section does not confer any power upon any court, in a suit by any private property owner, to enjoin as a private nuisance what is merely a violation of the zon-

ing ordinance. We therefore agree with the conclusion of the trial justice in his decision that no relief can be afforded to the complainant on this second ground relied upon by it.

These conclusions by us, that the complainant was not entitled to an injunction on either of its first two grounds, render it unnecessary for us to decide the question, above mentioned, as to whether this complainant is entitled to rely, in this court, upon grounds for relief which were stated in its bill of complaint, but were overruled by the trial justice.

The only vital remaining question, then, is whether, apart from the matter of zoning, the evidence in the cause supported a conclusion that the erection of a coalpocket at the location where the respondent intends to erect one, and its operation in the manner in which the respondent intends to operate it, would constitute a private nuisance, which the complainant is entitled to have prevented by an injunction. Clearly the complainant is not entitled to an injunction merely against its *erection,* as that would do the complainant no harm.

We have investigated and considered many authorities, in this state and elsewhere in this country, which throw light upon a vital question of law in this cause. This is the question of the proper rule to be applied, when an injunction is sought, by the owner of certain real property or a certain business enterprise, to prevent, on the ground that such operation will constitute a private nuisance to such owner, the merely *proposed* operation by another of a certain business, in a certain manner, and in a structure to be erected by the latter in the vicinity of the former's real property or business enterprise. This question is often referred to by judges and textwriters as that of an "anticipated nuisance".

The only case in this state which seems to us to throw any special light on this question is *O'Reilly* v. *Perkins,* 22 R. I. 364. In that case a demurrer was sustained to a bill of complaint, by which an injunction was sought against

the building and operation of a brewery in a certain location, on the ground that it would "necessarily become a nuisance". This court said, at page 365: "If a brewery *per se* is not a nuisance, as is admitted, we cannot grant an injunction against building and operating a brewery. If the operation of a brewery in any certain way is a nuisance, we may grant an injunction against such a mode of operation."

This court cited and relied upon *Bowen* v. *Mauzy,* 117 Ind. 258, where a demurrer was sustained to a bill in which an injunction was sought to prevent the establishment and operation of a blacksmith's shop twenty-eight feet from the complainant's residence, and in which, among other allegations, was one that the gases and smoke from the respondent's forges would fill the complainant's house with smoke and smells unbearable and offensive to his senses and very injurious to himself and his family.

This court, at page 366, said, as to this and other allegations in the bill in the Indiana case: "The court held these allegations, except that the blacksmith's shop was to be operated, to be mere conclusions which might not be verified by the event and which did not constitute sufficient ground for granting an injunction."

In their brief in the instant cause counsel for the complainant quote, as a correct statement of the proper rule, the first sentence of a note in 7 A. L. R. 749, entitled: "Right to enjoin threatened or anticipated nuisance." This sentence is as follows: "It is well settled that a court of equity may enjoin a threatened or anticipated nuisance, public and private, where it clearly appears that a nuisance will necessarily result from the contemplated act or thing which it is sought to enjoin."

At page 785 of the same note the following rule is stated and in support of it a very large number of cases from many jurisdictions are cited: "And the rule that a court of equity will not interfere where the threatened nuisance is not inevitable, but only contingent, depending on the manner of operation, use or other future circumstances, has been ap-

plied in cases involving various kinds of nuisances." See also stringent rule stated, and cases cited in support of it, at page 321 of a note in 3 A. L. R. 312.

In *City of Lynchburg* v. *Peters*, 145 Va. 1, the court says: "It is a well established principle of equity jurisprudence that where a proposed structure, or the use of it, is not a nuisance *per se*, a court of equity will not grant an injunction against the erection of the structure or the use, merely because it may become a nuisance. The alleged nuisance must be the necessary result or the court will await the actual results." See, further, the rules laid down and authorities cited in *Wolcott* v. *Melick*, 11 N. J. Eq. 204, at 207; *Rouse & Smith* v. *Martin & Flowers*, 75 Ala. 510; *Pennsylvania Co.* v. *Sun Co.*, 290 Pa. 404; *Robinson* v. *Dale*, 62 Tex. Civ. App. 277; *Wolfschlager* v. *Applebaum*, 213 Mich. 180, at 184; *Lansing* v. *Perry*, 216 Mich. 23.

We are of the opinion that to justify an injunction, in a cause of the character of the instant one, the evidence must show clearly and convincingly that substantial damage to the complainant's property or business will be practically certain to result from the operation by the respondent of the business against which an injunction is sought.

Certain language, used by the trial justice very near the end of his decision and above quoted therefrom, seems to indicate that in arriving at his final conclusion in the cause he was much influenced by the facts that the complainant's business was a long and well established one and involved a large investment of capital. But we cannot see why these facts should be taken into consideration in determining whether a permanent injunction should be decreed.

We have carefully considered the relevant evidence in this cause, being almost entirely opinion evidence, on the question whether substantial damage to the complainant will be practically certain to result from the operation by the respondent of its proposed business, in the place and in the manner in which the respondent intends to operate it; and we are of the opinion that it has not been proved

by clear and convincing evidence that such damage will be practically certain to result. We therefore are of the opinion that the respondent's appeal should be sustained.

The respondent's appeal is sustained; the decree appealed from is reversed; and the cause is remanded to the superior court for the entry of a decree dismissing the bill of complaint.

*Charles E. Tilley, John J. Dunn, Eugene J. Phillips, Swan, Keeney & Smith,* for complainant.

*Clarence E. Roche,* for respondent.