COMMERCE OIL REFINING CORPO-
RATION, Plaintiff,

v.

William W. MINER et al., Defendants.

Civ. A. No. 2113.

United States District Court
D. Rhode Island.

Jan. 5, 1959.

See also, 22 F.R.D. 5.

Letts & Quinn, Providence, R. I. (Andrew P. Quinn, Daniel J. Murray, A. Peter Quinn, Jr., Providence, R. I., of counsel), Simpson Thacher & Bartlett, New York City (Stephen P. Duggan, Jr., Richard Hawkins, New York City, of counsel), for plaintiff.

Cornelius C. Moore, Newport, R. I. (Salvatore L. Virgadamo, Francis J. Boyle, Newport, R. I., of counsel), Higgins & McCabe, Providence, R. I. (James A. Higgins, William C. Dorgan, Providence, R. I., of counsel), Charles H. Drummey, Providence, R. I., for defendants.

DAY, District Judge.

This is an action wherein the plaintiff seeks damages and injunctive relief against the defendants. Jurisdiction of this Court is based on diversity of citizenship and the existence of a controversy in the requisite amount.

Plaintiff's complaint contains two counts. In the first count plaintiff alleges in substance that on or about September 27, 1956, a license to engage in the refining, manufacturing and processing of petroleum products was issued to it by the Town Council of the Town of Jamestown in accordance with the provisions of Chapter 50 of the ordinances of said Jamestown, and that it paid a fee of $5,000 for said license; that refinery operations are a permissive use in a refinery use district in said town; that

under the ordinances of said Jamestown, the laws of the State of Rhode Island and of the United States, plaintiff has a right to construct and operate a plant for the purpose of conducting refinery operations and intends to construct and operate such a refinery forthwith in such a refinery use district in said Jamestown; that the defendants have unlawfully combined and conspired to harass, delay and prevent plaintiff from exercising its right to construct and operate said refinery in said Jamestown; that pursuant to said unlawful combination and conspiracy to deprive plaintiff of its said right the defendants have unlawfully and maliciously resorted to the use of unlawful means, including certain overt acts, which are alleged therein; that it is informed and believes and alleges on information and belief that the defendants in furtherance of said unlawful combination and conspiracy intend to perform further acts to harass, delay and prevent it from constructing and operating said refinery, and that it has been damaged in the sum of $500,000. In this count, plaintiff demands that the defendants be enjoined during the pendency of this action and permanently "from unlawfully combining and conspiring against the plaintiff and from taking any action designed to harass, delay or prevent plaintiff from exercising its said rights etc.", and that it have judgment against the defendants and each of them in the sum of $500,000, the costs of this action and exemplary or punitive damages.

The second count alleges a cause of action arising under the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, with jurisdiction of this Court based on the provisions of the Clayton Act, 15 U.S.C.A. § 12 et seq.; repeats the allegations with respect to the license, etc. contained in the first count; seeks similar injunctive relief as that demanded therein, and judgment against the defendants and each of them in the sum of $1,500,000, reasonable attorneys' fees and costs.

Defendants in their answers assert that the license upon which the plaintiff relies is invalid, that the amendment to the zoning ordinance of Jamestown creating a refinery use district is invalid, and that the amendment to the building ordinance whereby plaintiff was excused from compliance therewith is invalid. In addition, they filed counterclaims wherein they allege the invalidity of said license, the invalidity of said amendment to said zoning ordinance, and of said amendment to the building ordinance. They also allege therein that the value of the real estate owned by them will be substantially reduced and destroyed, and that said real estate will be rendered unfit and uncomfortable for its enjoyment by the erection and operation of said refinery, and that said refinery will constitute a continuing nuisance to them.

In their counterclaims the defendants seek a declaratory judgment that said license and said amendments are void; and temporary and permanent injunctions enjoining the plaintiff from taking any further action or doing any act purported to be authorized under said license and said amendments; and such other or further relief as may be required by equity and good conscience.

Plaintiff in its reply to the counterclaims denies that said license and amendments are invalid, and further by way of defense to said counterclaims alleges that the defendants have been guilty of such laches as should in equity bar them from maintaining said counterclaims because the plaintiff "in reliance on the validity of said ordinances and said license" and on defendants' failure to bring any legal or equitable proceedings to challenge the validity thereof has taken certain steps, including the acquisition of lands, the expenditures of large sums of money, etc.

Subsequent to the filing of its reply, the plaintiff moved for the entry of a summary judgment in its favor dismissing said counterclaims. This motion was denied by me on February 7, 1958. See Commerce Oil Refining Corporation v. Miner, D.C., 22 F.R.D. 5.

When this case was reached for trial, plaintiff announced in open court that it

did not intend to offer any evidence in support of its claim of an illegal conspiracy by the defendants against it, and upon motion by the defendants its complaint was dismissed with prejudice. The trial then proceeded on the defendants' counterclaims.

The trial, which lasted for more than forty days, produced a record of nearly 6,000 pages and a great many exhibits. Apart from the presentation of detailed testimony as to the circumstances attendant upon the adoption of said amendments to the zoning and building ordinances and the adoption of an ordinance and the issuance to the plaintiff of a license thereunder, many days of the trial were devoted to the presentation of testimony by expert witnesses on the question of whether the operation of the refinery as planned will constitute a nuisance to the defendants.

The issues developed by the pleadings and the evidence are (1) the validity of said amendments to the zoning and building ordinances, (2) the validity of the license granted to the plaintiff and (3) whether the operation of said refinery at the location specified and in the manner proposed by the plaintiff will constitute a nuisance to the defendants or any of them.

■■ Plaintiff contends that the defendants have no standing to attack the validity of amendments to the zoning and building ordinances or the validity of the license or the ordinance pursuant to which it was granted. In my opinion this contention is without merit. It is well settled in Rhode Island that if a party can show that an amendment to a zoning ordinance is illegal and that the value of his property is injured or substantially threatened with injury by its enforcement, he is entitled to relief in equity with respect to such illegal amendment. In Rhode Island Home Builders v. Hunt, 1948, 74 R.I. 255, at page 259, 60 A.2d 496, at page 498, the Supreme Court said:

" * * * When his rights are injured or substantially threatened with injury by the enforcement of the alleged illegal amendment to the zoning ordinance and he is able to establish the illegality of such amendment, he has ample remedy through ordinary proceedings in equity."

That the same rule applies in Rhode Island to the amendment to the building ordinance and license aspects of this case is implicit in the decision of the Supreme Court of Rhode Island in Order of St. Benedict in Portsmouth v. Town Council of Portsmouth, R.I.1956, 120 A.2d 329. In that case the petitioner applied for certiorari to review and quash the action of the respondents in granting a building permit to erect and a license to operate an oil refinery to the plaintiff in this action. The Supreme Court in refusing to grant the relief sought pointed out that at common law the issuance of a writ of certiorari rested in the discretion of the Court, and held that in the exercise of that discretion it would not issue the writ because of the pendency of other proceedings in equity instituted by the petitioner to secure relief from the grievances alleged in the petition for certiorari.

■ Similarly, the federal courts have long adhered to the doctrine that private persons may attack the validity of municipal ordinances in equity proceedings when ordinary remedies do not afford full protection against the threat of substantial harm. General Electric Ry. Co. v. Chicago, I. & L. Ry. Co., 7 Cir., 1900, 98 F. 907, affirmed on rehearing 107 F. 771; Seattle Gas & Electric Co. v. Citizens' Light & Power Co., C.C.C.Wash.1903, 123 F. 588.

In this case the defendants have produced ample evidence that their rights are substantially threatened with injury by the continued enforcement of said amendments to the zoning and building ordinances, and the ordinance under which said license was granted. Under the laws of Rhode Island the defendants thus have standing presently to attack their validity in this Court.

I

Validity Of The Amendments
To The Zoning And Building
Ordinances

■■ The original zoning ordinance of the Town of Jamestown which the Town Council purported to amend by the creation of said refinery use district on September 27, 1956 was adopted on August 28, 1935. The evidence establishes and plaintiff concedes that due notice of the hearing on its proposed adoption was not given prior thereto as required by the state enabling act authorizing cities and towns to adopt zoning ordinances. As a consequence thereof the zoning ordinance was invalid and void on September 27, 1956 when the Town Council purported to enact the amendment thereto creating the so-called refinery use district. R. I. Home Builders, Inc. v. Budlong Rose Co., 1950, 77 R.I. 147, 74 A.2d 237. Since it was void, the amendment thereto is likewise void unless it can be said to be complete and perfect in and of itself. Lassiter v. Atlantic City, 1914, 86 N.J.L. 87, 90 A. 675; City of Chicago v. McKinley, 1931, 344 Ill. 297, 176 N.E. 261; Board of Commissioners, City of Newark v. Grodecki, 1943, 33 A.2d 115, 21 N.J.Misc. 241; cf. City of La Crosse v. Elbertson, 1931, 205 Wis. 207, 237 N.W. 99. It is obvious that the amendment was not intended as an original zoning ordinance independent of and apart from that which it purported to amend, and if it were so intended, it must be deemed to be void and of no effect because as the record establishes it was not, prior to its enactment, approved by a financial town meeting of said Town of Jamestown, as required by Sec. 1 of Chapter 342 of the General Laws of Rhode Island, Revision of 1938. Cf. R. I. Home Builders, Inc. v. Budlong Rose Co., supra.

■ Prior to its amendment, the building ordinance of said Town, Chapter XLIV, contained among other provisions, the following:

"Section 3. Every person intending to build, construct, reconstruct or alter any building structure or foundation, including temporary structures, platforms or stands for assembly purposes, shall before commencing the same, file with the Inspector of Buildings an application for a building permit on a form provided therefor, shall pay a fee therefor at the rate of $1.00 for each $1000 of estimated cost of the structure and shall at any time, if required by the Inspector of Buildings or Board of Appeal, file the plans, specifications and details or other full and accurate description of the intended building, construction or reconstruction or alteration. This shall be in addition to such permits as may be required by the laws of Rhode Island for specific classes of building."

Said amendment, adopted September 27, 1956, contains the following provision:

"Section 48. The provisions of this ordinance, Chapter XLIV, shall not apply to buildings, structures, foundations, storage tanks, vessels, or any other facility constructed, to be constructed or altered, designed or used for the refining of petroleum or the manufacture, process or storage in bulk or commercially of gasoline, gas, crude petroleum, gasoline, kerosene, heating fuels, lubricating oils and greases, or of allied petroleum products or substances derived from the refining of petroleum."

The effect of said amendment is to exempt all buildings, structures and other facilities used for the refining of petroleum and allied products from the provisions of the building ordinance of said Town. Authority to enact said building ordinance and any amendment thereto was conferred upon said Town by the provisions of section 52 of Chapter 333 of the General Laws of Rhode Island, Revision of 1938 as added by Pub.Laws 1950, c. 2525, § 1, which in part provided as follows:

"Sec. 52. Town and city councils and the representative council of the city of Newport may from time to time make and ordain all ordinances

and regulations for their respective towns and cities, not repugnant to law, as they may deem necessary, regulating the manner of constructing and equipping of all buildings and other structures within said town or city which may be erected, altered or repaired after the passage of such ordinance. \* \* \*"

Defendants contend that this statute only authorize the Town by ordinance to regulate the manner of constructing and equipping *all* buildings and other structures within said town, and did not authorize it to regulate the manner of constructing and equipping some buildings and to exempt others from all regulation. Plaintiff, on the other hand, claims that said statute permits but does not require the regulation of the manner of constructing and equipping of all buildings and structures in the event a municipality elects to enact a building ordinance pursuant thereto, and that reasonable classification and exemption from building regulations are not prohibited thereby. Assuming but without deciding that plaintiff's interpretation of said statute is correct, the specific exemption from said ordinance provided by said amendment is in itself a regulation within the meaning of said statute. To be valid the regulations and ordinances of a municipality "must find their justification in some aspect of the police power, asserted for the public welfare." Village of Euclid, Ohio v. Ambler Realty Co., 1926, 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303. They must bear a rational and substantial relation to the health and safety of the community. Doherty v. Town Council of South Kingstown, 1938, 61 R.I. 248, 200 A. 964; Robinson v. Town Council of Narragansett, 1938, 60 R.I. 422, 199 A. 308; Standard Oil Co. of New Jersey v. City of Charlottesville, 4 Cir., 1930, 42 F.2d 88; 5 McQuillin, Municipal Corporations (3rd ed.) § 19.14.

It is a matter of common knowledge that an oil refinery is a potential source of danger from fire and explosion unless properly constructed. And it is similarly a matter of common knowledge that such danger from fire and explosion can be substantially lessened if not entirely eliminated by the imposition of proper restrictions and safeguards relating to its construction.

The record in this case is completely devoid of any evidence which could possibly support a finding that said amendment to the building ordinance is conducive to the conservation of the public health, safety or welfare of said Town. In my opinion it cannot be sustained as being within the lawful exercise of the police power of the municipality, and is accordingly invalid.

II

Validity Of The License

Plaintiff's license was granted pursuant to Chapter 50 of the ordinances of said Town of Jamestown which was also enacted on September 27, 1956, at the same meeting of the Town Council when the amendment to the building ordinance hereinbefore discussed was adopted by that body. It was enacted pursuant to the provisions of section 21 of Chapter 333 of the General Laws of Rhode Island, Revision of 1938 as amended by Pub.Laws 1953, c. 3233, § 1, which provides as follows:

"Sec. 21. Town councils and city councils may from time to time make and ordain all ordinances and regulations for their respective towns, not repugnant to law, which they may deem necessary for the safety of their inhabitants from the manufacture, processing, storage, keeping, having in possession, transportation, sale or use of \* \* \* crude petroleum, gasoline, kerosene, heating fuels, lubricating oils and greases, allied petroleum products, and any and all other explosives, explosive chemicals and inflammable substances; and may prohibit the manufacture, storage, keeping, having in possession, transportation, sale or use by any and all person or persons of any or all said substances and gases in their respective towns, unless a license for the same shall be

first obtained from the town council or board of aldermen, which license shall be henceforth effective unless revoked for good and sufficient cause by order of said town council or board of aldermen. * * *"

Section 1 of said Chapter 50 is as follows:

"Section 1. No person, firm or corporation shall, from and after the passage of this ordinance, engage in the refining, manufacturing or processing of crude petroleum, petroleum products or substances derived therefrom in connection with such refining, manufacturing or processing of crude petroleum, petroleum products or substances derived therefrom within the Town unless a license for the same shall be first obtained from the Town Council."

Section 2 thereof sets forth the information which must be furnished by an applicant for a license but includes a provision that the Town Council may at any time upon such terms and conditions as it may deem advisable waive "the filing of any of the foregoing requirements". Section 3 provides that the Town Council may consider and take such action on any application for a license under said ordinance as it "may deem proper with due consideration for the safety of the inhabitants of the Town of Jamestown". Section 5 of said ordinance provides that no licensee shall engage in the refining, etc. of crude petroleum except upon certain conditions therein set forth in sub-sections 5(a) to 5(h) inclusive. Most, if not all, of these sub-sections incorporate by reference standards promulgated by certain national organizations.

Sub-section 5(a) provides that all facilities used for refining, etc. shall be constructed, installed, etc. so as to conform at all times with the "Standards of the National Board of Fire Underwriters for the Storage, Handling and Use of Flammable Liquids as Recommended by the National Fire Protection Association". Sub-section 5(b) provides that all pressure vessels used for refining, etc.

shall be constructed, installed, etc. so as to conform at all times with the standards set forth in the American Petroleum Institute—American Society of Mechanical Engineers 'Code for Unfired Pressure Vessels for Petroleum Liquids and Gases' (1952) or 'Rules for Construction of Unfired Pressure Vessels, Section VIII, ASME Boiler Construction Code' (1950), of the American Society of Mechanical Engineers. Sub-section 5(c) provides that all heat exchangers shall be constructed, installed, etc. so as to conform at all times with the standards set forth in the American Petroleum Institute—American Society of Mechanical Engineers Code for 'Unfired Pressure Vessels for Petroleum Liquids and Gases' (1952) and the standards of the Tubular Exchanger Manufacturers Association, Class R. Sub-section 5(d) provides that all piping systems shall be constructed, installed, etc. so as to conform at all times to the applicable portions of the 'American Standard for Pressure Piping', (A.S.A. B31.1–1951), and sub-section 5(e) provides that all electrical equipment shall be constructed, installed, etc. so as to conform to the standards of the National Electrical Code. Sub-section (f) requires that all premises used in the refining, etc. of crude petroleum shall be surrounded by a fence of non-combustible materials of a minimum height with "a sufficient number of gates to provide adequate access for fire extinguishing purposes", and sub-sections (g) and (h) contain requirements for the installation of a foam-fire protection system and first aid fire control equipment according to certain standards incorporated by reference therein.

The parties agree that said ordinance was adopted without a public hearing on the question of its enactment and without notice of such hearing by publication in a newspaper as provided in said section 52 of Chapter 333 which authorizes town and city councils to make and ordain ordinances regulating the manner of constructing and equipping of all buildings and structures in their respective towns

and cities. This section provides in part as follows:

"52 * * *

"No such ordinance shall be enacted, amended or repealed until after a public hearing has been held upon the question of the enactment, amendment or repeal of such ordinance, before said town, city or representative council, which council shall first give notice of such hearing by publication in a newspaper printed in said town or city, if any, and, if none, then in a newspaper published in the county in which said city or town is located. * * * "

Defendants contend that said Chapter 50 is invalid because (1) the standards incorporated by reference therein were not in fact known to the Town Council, (2) it is in reality a building ordinance and was not enacted after a public hearing of which notice was given by publication in a newspaper as provided in said section 52 of Chapter 333 of the General Laws of Rhode Island, Revision of 1938, (3) the provisions contained therein for an appeal from actions of the Town Council thereunder are invalid and (4) it lacks definite standards for the grant of licenses thereunder.

In my opinion it is unnecessary for me to consider all of the aforesaid contentions. Although counsel for the parties hereto during the trial and in their respective briefs have consistently referred to said Chapter 50 as "the licensing ordinance", it is entitled "An Ordinance Authorized By Section 21 Of Chapter 333 of the General Laws of Rhode Island (1938) As Amended, Providing For The Safety Of The Inhabitants Of The Town Of Jamestown From The Refining, Manufacturing Or Processing Of Crude Petroleum, Petroleum Products Or Substances Derived Therefrom, Or The Storage Or Handling Of Crude Petroleum, Petroleum Products Or Substances Derived Therefrom In Connection With Such Refining, Manufacturing Or Processing Of Crude Petroleum, Petroleum Products Or Substances Derived Therefrom".

While it is true that the legislative intent is to be found primarily in the language of an ordinance, yet that language is to be construed in the light of the facts and circumstances attendant upon the passage of such ordinance. Cf. Blais v. Franklin, 1910, 31 R.I. 95, 77 A. 172. It must be remembered that said Chapter 50 was enacted at the same meeting at which said amendment to the building ordinance was adopted. This is an important circumstance to be considered in determining the intent of the Town Council in enacting said Chapter 50. Doherty v. Town Council of South Kingstown, supra.

I am unwilling to believe that the Town Council when it adopted said amendment to the building ordinance intended that there would be no regulations or restrictions of any sort on the manner of constructing and equipping the proposed refinery. On the contrary, a study of the provisions of said Chapter 50 and of the codes incorporated by reference therein satisfies me that the Town Council intended thereby to regulate its construction and equipment. In my judgment those sub-sections are for the most part building regulations within the purview of said section 52 of Chapter 333.

It is the well-settled rule that cities and towns have no powers to enact ordinances except those powers from time to time delegated to them by the legislature. And it is a fundamental rule of construction that such powers, being delegated, should be strictly construed. In re Opinion to the House of Representatives, 1939, 62 R.I. 347, 5 A.2d 455; Heeney v. Sprague, 1877, 11 R.I. 456.

The only authority vested in the cities and towns of this state to enact building ordinances is that conferred upon them by said Section 52. Its provisions clearly preempt the field; and when such authority is conferred it may only be exercised in strict conformity with the terms of the grant. Standard Oil Co. of New Jersey v. City of Charlottesville, supra; cf. R. I. Home Build-

ers, Inc. v. Budlong Rose Co., supra. Absent such compliance, it follows that the provisions of said sub-sections 5(a) to 5(h), inclusive, insofar as they are building regulations are null and void.

The question then arises— what is the effect of their invalidity? Chapter 50 contains a "severability clause", so-called, which in essence provides that if any provision or provisions thereof shall be declared invalid, this determination shall in no wise affect the validity of its remaining provisions. But such a clause is not decisive of the effect of the invalidity of a portion or portions of an ordinance upon its remaining portions. The rule is well stated in Heubeck v. Mayor and City Council of Baltimore, 1954, 205 Md. 203, 107 A.2d 99, at pages 103-104, where the Court held:

" * * * regardless of such a clause, an act must fail entirely if the effect of declaring a portion of it invalid would render the remainder incapable of effecting the purpose for which the act was enacted."

To the same effect, see In re Narragansett Indians, 1898, 20 R.I. 715, 40 A. 347; State v. Tonks, 1886, 15 R.I. 385, 5 A. 636; F. T. B. Corporation v. Goodman, 1949, 300 N.Y. 140, 89 N.E.2d 865.

It is manifestly clear that the Town Council by the enactment of the sub-sections 5(a) to 5(h), inclusive, intended to control the manner of constructing and equipping of the refinery as well as its manner of operation. Since the provisions of said sub-sections which I have found to be null and void are so interwoven with the remaining provisions of section 5 thereof that they cannot be separated, it follows that section 5 must fail in its entirety. The invalidity of said section 5 compels me to conclude that the whole of Chapter 50 must likewise fail, because the intention of the Town Council will not be served by the remaining portions of said chapter which, if given effect, would leave the construction, equipping and operation of the proposed refinery without effective control or regulation by the Town Coun-

cil. It follows that the license issued pursuant thereto is also invalid.

### III

#### The Issue Of Anticipated Nuisance

The determination of whether the erection and operation of the proposed refinery will constitute a continuing nuisance to the defendants must be determined by resort to Rhode Island law.

In Blomen v. N. Barstow Co., 1913, 35 R.I. 198, 209-210, 85 A. 924, 926, 44 L.R.A., N.S., 236, the Supreme Court of Rhode Island quoted with approval the rule laid down in Campbell v. Seaman, 63 N.Y. 568 at page 576:

" 'As to what is a reasonable use of one's own property cannot be defined by any certain general rules, but must depend upon the circumstances of each case. A use of property in one locality, and under some circumstances, may be lawful and reasonable, which, under other circumstances, would be unlawful, unreasonable, and a nuisance. To constitute a nuisance, the use must be such as to produce a tangible and appreciable injury to neighboring property, or such as to render its enjoyment specially uncomfortable or inconvenient' ".

And in determining whether a particular use is a nuisance, the location thereof is an important consideration. In Kennedy v. Frechette, 1924, 45 R.I. 399, 405-406, 123 A. 146, 148, the Supreme Court said:

"The location is always an important consideration in the determination of the existence of a nuisance. It is clear that the location * * * is *not* a manufacturing one. * * Is the use of the property in the particular location reasonable or unreasonable, considering, not only the rights of the owner, but also those of his neighbor? If such use causes a substantial diminution either in the value of adjacent property, or in the

enjoyment thereof as measured by the degree of comfort which the average man living in such a neighborhood has a right to expect, it may properly be held to be unreasonable, and hence a nuisance."

To the same effect, see Aldrich v. Howard, 1865, 8 R.I. 246; Strachan v. Beacon Oil Co., 1925, 251 Mass. 479, 146 N.E. 787; Dahl v. Utah Oil Refining Co., 1927, 71 Utah 1, 262 P. 269.

■ Defendants seek a permanent injunction against the proposed erection and operation of said refinery as an anticipated nuisance. To entitle them to that relief under the law of Rhode Island, the evidence must show clearly and convincingly that substantial diminution in the values of their properties or in the enjoyment thereof will be practically certain to result from the erection of the refinery or from its operation. In Otto Seidner, Inc. v. Ralston Purina Co., 1942, 67 R.I. 436, at page 452, 24 A.2d 902, 909, where plaintiff, the owner of a business, sought an injunction to prevent the defendant from erecting and operating a coal pocket in an industrial district on the ground that the proposed erection and operation of said coal pocket would constitute a nuisance to the plaintiff, the Supreme Court held:

"We are of the opinion that to justify an injunction, in a cause of the character of the instant one, the evidence must show clearly and convincingly that substantial damage to the complainant's property or business will be practically certain to result from the operation by the respondent of the business against which an injunction is sought."

The Town of Jamestown is an island situated in Narragansett Bay within the State of Rhode Island. Its area is approximately 9.3 square miles. It is primarily a residential, resort and farming area. At the present time, no industries of any sort are located thereon and there are only relatively few business enterprises, such as retail shops, stores, gasoline filling stations and hotels. It enjoys considerable popularity as a resort area during the summer.

The refinery district, so-called, irregular in shape, extends completely across the northerly portion of the island. The area of this district in which plaintiff proposes to erect its refinery is 814.72 acres, of which 604.72 are owned by plaintiff and the remainder by other persons, including the defendants Florence E. B. Wright, George F. Wright, Louis F. Wright, Virginia C. Wright, Henry E. Wright, Rita Wright, George H. Wright and Virginia W. Wright, who have homes on their lands. At the time of the trial of this case there were sixteen (16) dwelling houses in said district, one having been destroyed by fire since September 27, 1956. The remainder of the land therein is vacant. While a small portion of it is swampy and overgrown with scrub, most of said land is cleared and dry. Eighty-five per cent of it was described in the testimony as good farm land, suitable for farming or home sites. South of said district and about two miles therefrom are at least one hundred forty-three homes in the Jamestown Shores development, so-called, and to the north and within about one and one-half miles therefrom there are seventy-one homes, a summer hotel and a camp comprising eleven or twelve buildings.

The evidence establishes that the prevailing winds on the island are from the southwest and from the northwest. Wind velocities during at least a third of the year range from calm to fourteen miles per hour and fogs of varying duration enveloping the island occur with relative frequency.

The defendant William W. Miner owns and resides on residential property which abuts upon the easterly end of said district. The remaining defendants are the owners and occupants of residential properties situated at points approximately two-thirds of a mile to four miles away from said district. The properties of the defendants Terrence F. McGaughan and Burgess Lunsford are located to the north of said district, and the properties of the remaining defendants to the south

and southeast of said district. The homes owned by the defendants range in value from $4,000 to $50,000. Most of them, if not all, are substantially constructed, well maintained and attractively landscaped.

During the trial the plaintiff produced upon the demand of the defendants what it termed the design plans of the proposed refinery. From the testimony presented by the plaintiff at the close of the defendants' evidence, it would appear that substantial changes in these plans had been effected by the plaintiff since the opening of the trial, in order to meet some of the criticisms thereof made by the defendants. If these changes purported to have been made have in fact been made, they would serve to eliminate or mitigate to some degree some of the sources of the nuisance which the defendants claim are certain to result from the operation of the proposed refinery. For the purpose of my decision, I shall assume that these changes have been made. But despite these assumed modifications, the evidence establishes that the proposed refinery will comprise, among other structures, at least fifteen stacks ranging from twenty to two hundred feet in height which will contain many thousands of feet of piping, countless joints and connections, nearly one hundred unfired pressure vessels of varying sizes and constructions, approximately four hundred pumps, thousands of seals and compressors, tanks, heat exchangers, and like equipment.

According to the evidence plaintiff will refine forty-three thousand (43,000) barrels of Kuwait crude oil each day in its refinery, slightly less than the total daily capacity of all the oil refineries in New England at the present time. Kuwait crude oil is a sour crude oil having a sulfur content of approximately 2.5%. The refinery will be operated twenty-four hours per day, seven days a week throughout the year, with brief shutdowns once a year for maintenance and repair purposes. The products to be produced are high octane gasoline, liquified petroleum gas (LPG), and heating fuel oils. By-products to be produced will be petroleum coke and elemental sulfur.

Three types of processes will be used to convert the crude oil into gasoline, LPG and heating oils. The first of these is distillation, wherein the crude oil is heated at very high temperatures and gas, gasoline and a variety of oils are separately boiled off at different temperatures and collected for further processing. This process, distillation, will occur in the crude and vacuum units of the refinery. A second process whereby gas, gasoline and heating oils are also produced will take place in the fluid catalytic cracking unit. In this process the molecular structure of a portion of the oil produced in the distillation process is chemically changed by the application of heat, pressure and a catalyst with the result that the larger molecules of oil are "cracked" into smaller molecules of gas, gasoline and heating oil. In the third process, smaller molecules of gas resulting from earlier processes are chemically converted by heat, pressure and catalysts into heavier molecules of gasoline in the alkylation and polymerization units.

In the various stages of the above processes large quantities of hydrogen sulfide are produced. Plaintiff proposes to collect this hydrogen sulfide and to convert it into elemental sulfur, a salable by-product. Hydrogen sulfide is a particularly malodorous gas described as having an odor like rotten eggs and as being detectable in very low concentrations. It is highly toxic and in sufficient concentrations injurious to health. Another inevitable product of the refining processes is the production of a group of gaseous hydrocarbons known as mercaptans. These are likewise particularly obnoxious and are detectable by smell in extremely low concentrations. Plaintiff proposes to collect and burn them in an incinerator and thereby prevent their escape to the atmosphere. An additional waste product similarly resulting of necessity from the refining processes is sulfur dioxide ($SO_2$). It is undisputed that the volume of $SO_2$ which will be discharged into the atmosphere from the stacks of the re-

finery will depend upon the efficiency of its sulfur recovery unit and upon the sulfur content of the fuel oil burned in the refinery to supply heat for its various processing units.

While the proposed refinery is so designed that fuel oil having a sulfur content in excess of four and one-half (4½) per cent may be burned in its heaters, plaintiff claims that it does not intend to use fuel oils having a sulfur content in excess of two and one-half (2½) per cent. It insists that it will use only fuel oils of that limited sulfur content regardless of their cost, and disclaims by at least one of its witnesses any intention of using the residuals from its crude vacuum unit to supply heat, although the design of the refinery would permit of such use. Much testimony of a conflicting nature as to the economics of such a practice and the likelihood of its being followed by the plaintiff was produced at the trial. However, giving full credence to the plaintiff's proposed intention in this regard and assuming that the sulfur recovery unit will operate at all times to its maximum efficiency, it is clear that the minimal quantity of $SO_2$ to be discharged each day into the atmosphere will be thirty-seven tons. $SO_2$ is a gas having a disagreeable, suffocating odor like that of burned sulfur matches. It is detectable in a concentration of 2.5 parts per million of the atmosphere, and in concentrations of more than five parts per million has an irritating effect upon the nose, throat and eyes. The extent of its irritant effect depends upon the length of one's exposure thereto. If the exposure be for only a few seconds, its effect may be only to produce tears. If exposure be prolonged, engorgement of the blood vessels of the eyes and irritation of the nose and throat result. In persons suffering from respiratory ailments or heart diseases its effect is to aggravate such ailments and diseases and produce added discomfort.

When combined with water or moisture in the atmosphere, $SO_2$ becomes converted into sulphurous acid which in turn may be converted into sulphuric acid.

These acids are highly corrosive to iron and steel and are destructive of plant life.

The crude oil to be refined will be brought by tankers from the Middle East to Jamestown. Plaintiff proposes to construct a landing dock off the east shore of the island from which the oil will be pumped through pipes to the crude storage area and then to the process units. The plans for the proposed refinery would seem to indicate that the crude oil will be kept at all times in an enclosed system from the time of its arrival through the completion of the refining processes. For this reason plaintiff contends that it follows that none of the offensive and obnoxious odors incident to and connected with the refining operations will escape into the atmosphere, with the exception of $SO_2$.

The evidence further shows that the plaintiff will draw large quantities of salt water from Narragansett Bay for cooling certain refinery units. The total amount so used will be at least 100,800,000 gallons each day. After circulating through the heat exchangers it will pass through a cooling pond and will be discharged into the bay. In addition, process water used in the refining processes and water used to wash platforms, walks and other areas in the processing units, amounting to more than 2,000,000 gallons each week, after treatment to remove certain hydrocarbon compounds with which it has become contaminated and after passing through an oxidation pond will also be discharged into the bay together with storm water accumulating in the processing units and in the crude storage area.

Considerable testimony was also presented by the parties as to the extent of the illumination of the refinery at night. While the extent of this illumination was sharply disputed, it is obvious that the refinery will be illuminated to a degree sufficient to permit persons employed therein to perform their work on the ladders, walks and platforms of the refinery structures and in the areas surrounding them, with efficiency and safety. Likewise, there was a sharp dispute

as to the amount of smoke that would be discharged by the refinery.

Many days were devoted to the presentation of opinion evidence as to the results that would accompany the operation of the refinery. For the expert witnesses, this trial must have been a dream realized.

Defendants contend that the evidence establishes that the erection and operation of said refinery will constitute a private nuisance to them against which they are entitled to injunctive relief. In support of their claim they argue that the evidence shows as certain sources of this nuisance the following: (1) the flare on the refinery; (2) the glare from the nocturnal illumination of the refinery structures; (3) dust emitted from the catalytic unit; (4) smoke emitted from the stacks and process heaters; (5) pollution of the waters of the bay by the discharge of waters used in the refining processes and of waters from the storm water system, and by virtue of spills and leaks in the loading and unloading of tankers; (6) discharge of $SO_2$ into the atmosphere; (7) the emission of hydrogen sulfide; (8) the emission of mercaptans; (9) the emission of general refinery odors; and (10) injury to health.

 Plaintiff, on the other hand, contends that the defendants failed to sustain the burden of proof imposed upon them in order to entitle them to the relief which they seek. In addition, they argue that the sentiment of the Town of Jamestown, as evidenced by the actions of the Town Council, though invalid, and by the vote of the qualified electors of said town in favor of the erection of a modern oil refinery is persuasive against the grant of any injunctive relief here. In support of this argument plaintiff quotes certain language from the opinion in Tuttle v. Church, C.C.R.I.1892, 53 F. 422. In my opinion, there is nothing in the holding in that case which supports such an argument. Moreover, that case is obviously distinguishable from the instant one. There the plaintiff sought to enjoin the operation of a factory which was engaged in the making of fish oils and fertilizers, which had been in operation for more than thirty years. In denying injunctive relief to the plaintiff the court found that not only had the plaintiff been guilty of laches, but that the defendant's plant caused only occasional offensive odors during the summer months and that its operation caused no serious damage to anyone. While the sentiment of the Town of Jamestown, as evidenced by the actions of the Town Council and by the vote of the electorate is a circumstance to be considered here, it must be remembered that they did not have the opportunity to consider and evaluate the detailed testimony by experts in oil refining that was presented during the protracted trial of this case.

To attempt to summarize the testimony of the numerous expert witnesses called by the parties would serve no useful purpose and would unduly prolong this opinion. While defendants have cited many respects in which they claim the proposed refinery will be a nuisance, entitling them to injunctive relief, I do not believe it necessary to consider or discuss all of them.

Here it is undisputed that obnoxious gases such as hydrogen sulfide and mercaptans will be produced in the refining processes. While the plaintiff contends that there will be no escape of these gases and cites the devices and procedures it will employ to contain them, neither the record nor the testimony of their experts sustains this contention. The most that can be said for said devices and procedures is that they will be nearly completely effective under the most ideal conditions. But having in mind the highly corrosive qualities of Kuwait crude oil and the volume of crude oil to be processed each day, I am satisfied that varying quantities of these obnoxious gases will find their way into the atmosphere at all times when the refinery is in operation. To assume that they will not be carried by the prevailing winds beyond the relatively small area upon which a refinery of the size contemplated is to be located would be far from realistic. On the contrary, the credible testi-

mony in this case establishes that said gases will be carried by the prevailing winds at all times to the properties of some of the defendants, and, because of their extremely disagreeable odors in very low concentrations and their cumulative effect, they will seriously diminish both the value of the defendants' lands as residential properties and the enjoyment thereof. The same observation may be made with respect to the general refinery odor described in the testimony as being an inevitable incident to refining operations.

Insofar as $SO_2$ is concerned, it is abundantly clear that at least thirty-seven tons thereof will be discharged into the atmosphere each day. It is undisputed that this malodorous gas is detectable by smell in a concentration of 2.5 parts per million and that in concentrations of more than five parts per million it has an irritating effect of varying degrees, depending upon the health of an individual and the length of his exposure to it. In answer to a hypothetical question which included no recital of the volume of $SO_2$ to be discharged from the stacks of the proposed refinery, an expert witness for the plaintiff testified that the ground concentration of $SO_2$ at a point beyond the nearest property line of the defendant Froberg would not exceed 0.4 parts per million under the most unfavorable conditions, and hence its presence would not be detectable on his property or beyond it. Under cross-examination, however, this same witness admitted that he could not determine such ground concentrations without knowledge of the volume of $SO_2$ that was being emitted by the stacks. His opinion as to ground concentrations of $SO_2$ is in my judgment entitled to no weight. The credible testimony satisfies me that, depending upon atmospheric conditions, wind velocities, and the prevailing winds, as shown by the evidence of past annual weather conditions on the Island of Jamestown, there will be frequent concentrations of $SO_2$ on the property of the defendant Froberg in excess of 2.5 parts per million, and that

it is reasonable to conclude that the properties of the other defendants will be frequently visited with similar concentrations carried to their premises by the prevailing winds, and that these concentrations will serve to effect a substantial diminution in the values of their properties and in the enjoyment thereof.

The evidence establishes that the State of Rhode Island has enacted legislation to prevent the pollution of public waters and that the Division of Sanitary Engineering of the Department of Health of said state has, pursuant to said legislation, promulgated regulations which prohibit the discharge of effluents from oil refineries into the public waters of said state except pursuant to a license granted only after the approval by said Division of the processes and methods of discharge. The evidence further discloses that the plaintiff has applied for such a license and that its proposed processes and methods, or at least some of them, appear to be under consideration by that Division. Under the circumstances, I am unwilling to assume that said Division will not perform the duties imposed upon it by said legislation in a competent and conscientious manner and believe that I should not now consider or pass upon that issue. See Interstate Milk Handlers v. Hoffman, 1955, 34 N.J. Super. 356, 112 A.2d 574; Kahl v. Consolidated Gas, Electric Light & Power Co., 1948, 191 Md. 249, 60 A.2d 754; cf. Willapoint Oysters, Inc. v. Ewing, 9 Cir., 1949, 174 F.2d 676, certiorari denied 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527; Ellison v. Rayonier, Inc., D.C.Wash.1957, 156 F.Supp. 214.

The evidence in this case also establishes beyond doubt that the area wherein plaintiff proposes to erect and operate its refinery is entirely residential and agricultural. Defendants' homes are substantial, attractive and well maintained. They afford their owners a degree of comfort and enjoyment not to be found in urban or industrial communities. The air of the locality is ideal from the standpoint of the absence of air pol-

lution. They are not now located in a manufacturing community where the air is inevitably impregnated with disagreeable odors and impurities, features that are the concomitants of life in such a community. Plaintiff now seeks to change the character of the area where defendants' homes are located by the establishment of its oil refinery therein.

In determining whether the proposed refinery will be a nuisance to the defendants against which they are entitled to relief, the fact that it may be useful or may contribute to the economic welfare of Jamestown, is not determinative. In Blomen v. N. Barstow Co., supra, the Supreme Court, in rejecting respondent's argument that the issuance of an injunction against the respondent would work a detriment to the public, 35 R.I. at page 205, 85 A. at page 928, quoted with approval from Broadbent v. Imperial Gas Co., 7 De G. M. & G. 436, aff'd 7 H.L.Cas. 601, where the court stated:

"If it should turn out that the company had no right so to manufacture gas as to damage the plaintiff's market garden, I have come to the conclusion that I cannot enter into any question of how far it might be convenient for the public that the gas manufacture should go on. * * * But unless the company had such a right, I think the present is not a case in which this court can go into the question of convenience or inconvenience, and say, where a party is substantially damaged, that he is only to be compensated by bringing an action toties quoties. That would be a disgraceful state of the law and I quite agree with the vice chancellor in holding that in such a case this court must issue an injunction, whatever may be the consequences with regard to the lighting of the parishes and districts which this company supplies with gas."

The plaintiff has not cited and I have been unable to find any decision of the Supreme Court of Rhode Island which in any way impairs the rule laid down in Blomen v. N. Barstow Co., supra. Certainly there is nothing in the opinion in Rose v. Socony Vacuum Corp., 1934, 54 R.I. 411, 173 A. 627, cited by the plaintiff, which may fairly be said to do so. The desirability of improving the economic welfare of the Town of Jamestown is beyond dispute. But that laudable objective is not to be attained by the erection and operation of the proposed refinery on plaintiff's lands if such use, considering not only the rights of the plaintiff but also those of the defendants, will be unreasonable and hence a nuisance.

After a careful consideration of all the testimony and the reasonable inferences to be drawn therefrom, and recognizing the right of the plaintiff to make a reasonable use of its lands, I am satisfied that the operation of said refinery in the manner and at the location proposed by the plaintiff will cause a substantial diminution both in the values of the defendants' properties and in the enjoyment thereof as measured by the degree of comfort which the average man living in such a locality has the right to expect. It follows that said use will be unreasonable and hence a nuisance to the defendants against which they are entitled to injunctive relief.

A judgment may be entered declaring that said license, said amendment to said Chapter XXXV and said amendment to said Chapter XLIV are null and void, and permanently enjoining the plaintiff from taking any further action or doing any act purported to be authorized by said license and said amendments and from operating said proposed refinery in said town of Jamestown.