PURCELL ET AL., APPELLANTS, *v.* DAVIS ET AL., RESPONDENTS.

(No. 7,427.)

(Submitted September 21, 1935. Decided October 15, 1935.)

[50 Pac. (2d) 255.]

482

*Mr. S. J. Rigney,* for Appellants, submitted a brief and argued the cause orally.

*Mr. Russell E. Smith, Mr. J. D. Fitzstevens* and *Mr. S. C. Ford,* for Respondents, submitted a brief; *Mr. Ford* argued the cause orally.

486

MR. JUSTICE MATTHEWS delivered the opinion of the court.

In November, 1934, the plaintiffs, Arthur and Amelia Purcell, instituted proceedings against the defendants, Kenneth Davis and R. C. Tarrant, copartners doing business under the name of the Cut Bank Refining Company, to enjoin the erection of a refinery or topping plant for the refining of crude oil in a residential district of Cut Bank, the county seat of Glacier county. The allegations of the complaint are that the plaintiffs are the joint owners of a lot on which three houses stand, one occupied by the plaintiffs and two by tenants, all of the reasonable value of $12,500, abutting on main street of the city and directly across the street from the city park, used for athletic sports; that the westerly line of the proposed site of the refinery is but 430 feet distant from the easterly line of plaintiffs' property and 20 feet above it in elevation, and the natural drainage is from the site to and across plaintiffs' lot; that the streets on three sides of the site are extensively traveled by the plaintiffs and others; that the defendants secured a permit from the city without notice or opportunity to protest the erection of the refinery on that site; and that the defendants have taken no steps or gone to any expense toward its erection. These allegations are not controverted.

The complaint then alleges that the erection and operation of the plant on the proposed site will create a nuisance by reason of the escape of fumes, gases and noxious vapors heavier than

air, which will settle upon plaintiffs' property, and the danger of explosion, fire, and drainage of waste matter from the plant. It is further alleged that the proposed establishment of the plant has caused a material depreciation in the value of plaintiffs' property, and that the erection and operation of the plant will destroy its value as residential property. The prayer is that the erection be enjoined and plaintiffs awarded $1,500 damages for loss already sustained.

Issue was joined by a general denial, and the cause was tried to the court. On the evidence adduced, the court made findings of fact and conclusions of law in favor of the defendants and entered judgment denying plaintiffs any relief, awarding the defendants their costs, and closing with the declaration: "This judgment is given without prejudice to the rights of the plaintiffs to pursue or assert any remedy or remedies, at law or in equity, on any cause or causes of action which may accrue to them on account of the operation of the said refinery."

The plaintiffs have appealed from the judgment. They make numerous assignments of error which, in the aggregate, but challenge the sufficiency of the evidence to support the findings of fact made, and the court's conclusions of law thereon.

The testimony on behalf of the plaintiffs was brief, but may be said to substantiate all the material allegations of the complaint. In addition to positive testimony on the subject of injury, the plaintiffs and others testified to conversations with the defendant Davis, in which he is quoted as saying that the operation of the plant would injure all of the objectors "somewhat, but Mr. Purcell would be injured most," and "there might be some offensive odors and fumes, but very little, he thought." Davis was sick at the time of the hearing and did not testify. To establish the allegation that the operation of the plant would constitute a nuisance, plaintiffs relied upon the testimony of M. C. Harrington, who had worked in and about oil refineries for about fifteen years. Testifying for the plaintiffs, Wayne Hart, manager of the defendants' refinery in operation some nine miles from Cut Bank, described the plant it was proposed

to erect, i. e., a plant similar to that in operation, each having a capacity of 300 barrels per day, but the new plant to have a greater storage capacity. Harrington testified that such a plant would give off more fumes than "an ordinary up-to-date refinery"; that the fumes would be of a "bad odor," offensive to most people, heavier than air; they would tend to creep along the ground, causing a sickly feeling and loss of appetite; that these fumes give off sulphur which settles a half mile or more from the plant and ruins vegetation and tarnishes silverware. The witness, however, stated that the distance fumes, gases and the like would carry depended upon the direction of the wind and "climatic conditions," but could always be smelled on the ground at the plant. He testified that the tanks of the proposed plant would be too close together for safety in case of fire or explosion; that he had witnessed fires and explosions at such plants, and that the effect thereof might be felt four to five hundred feet distant; and that he had never known of a refinery built in a residential district. On cross-examination the witness admitted that he had never worked in the Cut Bank district, and that, while the refinery in which he worked at Shelby refined some Cut Bank crude oil, it refined Kevin and Pondera crude, and that the Cut Bank crude has a much lower sulphur content than the Kevin and some less than the Pondera. The witness insisted that any stored gasoline would give off offensive odors.

On behalf of the defendants it was shown that the Cut Bank crude contained but 5/1000 of 1 per cent. sulphur. Hart testified that he had lived within 150 feet of the Cut Bank refinery for a year and a half; that no offensive odors escape from it; and that no discomfort has resulted to any person living near the plant. Mrs. Pearl Davis testified that she lived near the plant and has never noticed any obnoxious odors from its operation and her silver has not become tarnished, nor has her appetite ever been affected.

Two witnesses testified that they had visited the present plant and that there was no more smell about it than about the

ordinary service station. It was then shown that the intended location of the plant would be on the extreme portion away from plaintiffs' property, a distance of 720 feet from plaintiffs' east line and 820 feet from the dwelling-houses, and that the prevailing winds are from plaintiffs' property toward the proposed site.

E. M. Parkin, a graduate from the Montana University and with a Master of Arts degree from the University of Michigan and who testified, "I took my thesis Petroleum Engineering," and who had been in charge of the gasoline plant of the Montana Power Gas Company at Cut Bank for more than a year, testified as an expert on the subject of handling gasoline. He stated that the "Casing-head" gasoline he handled was more volatile than that handled at refineries, but that there was not sufficient vapor escaping from his operations to cause a fire hazard, and that there is no inherent danger in storing or in refining gasoline, if proper safeguards and precautions are taken. The witness stated that there were residences around the plant of which he is superintendent, and that, "We don't consider we are living in a hazardous place." It developed during his cross-examination that what was meant by an "up-to-date plant" was the use of the "Dubbs process or cracking process," while the defendants used the skimming process; the witness testified that the latter process was no more dangerous than the former.

At least half a dozen witnesses testified that there is nothing inherently dangerous in the operation of a refinery as this one would be operated, nor in the storage of large amounts of gas, oil and other products. It was demonstrated that the plant would be so supplied with catch basins and reservoirs that no waste could escape, nor could products flow from the grounds in case of the bursting of the tanks. It was shown that the furnaces would he heated by natural gas, bricked in, and that there would be no danger of fire escaping.

This short *résumé* of the testimony demonstrates that there was a sharp conflict therein, which conflict was resolved by the court in favor of the defendants, and that it cannot be

said that the evidence preponderates against its findings. In these circumstances we are not permitted to disturb the findings of the trial court. (*Kummrow* v. *Bank of Fergus County*, 66 Mont. 434, 214 Pac. 1098; *Nuhn* v. *Nuhn*, 97 Mont. 596, 37 Pac. (2d) 571.)

The question then arises as to whether the findings justify the court's conclusions of law and the denial to the plaintiffs of present relief. Refining crude oil is a legitimate business and such a refinery is not a nuisance *per se*, but it may become a nuisance by the manner in which it is constructed or operated. (*Helms* v. *Eastern Kansas Oil Co.*, 102 Kan. 164, 169 Pac. 208, L. R. A. 1918C, 227; *Waier* v. *Peerless Oil Co.*, 265 Mich. 398, 251 N. W. 552; *Dahl* v. *Utah Oil Refining Co.*, 71 Utah, 1, 262 Pac. 269; *McDonald* v. *Home Oil Co.*, (Tex. Civ. App.) 241 S. W. 274.) And even though the plant is properly erected and operated, it may become a nuisance if it gives off noxious fumes. (*Waier* v. *Peerless Oil Co.*, above.)

In the instant case the evidence is to the effect that, if Cut Bank crude alone is refined, there will be no nuisance created in this respect, but, under the testimony of Harrington, if Kevin or other crude containing a considerable percentage of sulphur or hydro-sulphite is refined, the plant may become a nuisance. It is true, as asserted by plaintiffs, that the defendants did not show that the plant would handle only Cut Bank crude, but that is the implication from the testimony, and, on the other hand, there is no showing that it would handle any other crude. The question as to whether or not the plant will hereafter become a nuisance by reason of fumes from the nature of the crude refined is one for future determination, if it arises, and, by the final clause of the judgment, above, the court provided for such a contingency.

One may use his own property as he sees fit for all purposes to which it is adaptable, without being answerable for the consequences, if he is not an active agent in designedly causing injury, if he does not create a nuisance, or if he exercises due care and caution to prevent injury (*Fleming* v. *Lockwood*, 36 Mont. 384, 92 Pac. 962, 122 Am. St. Rep. 375, 13 Ann. Cas.

263, 14 L. R. A. (n. s.) 1628), but must so use his right as not to infringe upon the rights of another. (Sec. 8743, Rev. Codes 1921.) "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property * * * is a nuisance." (Sec. 8642, Id.) The maintenance of a nuisance may be enjoined (*Newton* v. *City of Roundup*, 60 Mont. 24, 198 Pac. 441), and a private person may maintain an action to abate a public nuisance, if it causes him special or peculiar injury (*Faucett* v. *Dewey Lumber Co.*, 82 Mont. 250, 266 Pac. 646; *State ex rel. Ford* v. *Young*, 54 Mont. 401, 170 Pac. 947.)

The operation, in a residential district, of any business which materially injures property and annoys residents will be enjoined (*Clay County Ice Co.* v. *Littlefield*, 187 Ark. 911, 63 S. W. (2d) 530; *McIntosh* v. *Brimmer*, 68 Cal. App. 770, 778, 230 Pac. 203; *Alster* v. *Allen*, 141 Kan. 661, 42 Pac. (2d) 969); but in this jurisdiction it is said that section 8642, above, must be given a "common-sense construction." "On the one hand, it takes care that a legitimate * * * business * * * shall not be suppressed on account of some imaginary or trifling annoyance, which offends the over-refined tastes or disturbs the supersensitive nerves of a fastidious person; on the other, it does not permit anyone, whatever his circumstances, to be driven from his home, or compelled to live in it in positive discomfort, in order to accommodate another, in the pursuit of his business which offends the mind and taste of the average individual." (*Cavanaugh* v. *Corbin Copper Co.*, 55 Mont. 173, 174 Pac. 184, 185.)

The rule in the foregoing cases applies where there is actual, present and substantial injury. Formerly equity would not act unless the existence of the nuisance had been established in a court of law, and, even in late cases, some courts have held that equity will not intervene unless the fact of nuisance has been found by a jury or the wrong complained of constitutes a nuisance *per se;* but modern practice would seem to permit

the issuance of an injunction without prior action in a court ▮ of law. "However this may be, it is settled that the issuance of an injunction to restrain a nuisance is not *ex debito justitiae,* but a matter resting in the sound discretion of the chancellor." (20 R. C. L. 474.).

Under the modern liberal practice, it has been held that equity ▮ will enjoin the construction of buildings when the anticipation of danger is real and substantial and would be shared by the average person of normal sensibilities (*Ferry* v. *City of Seattle,* 116 Wash. 648, 200 Pac. 336, 203 Pac. 40; *Everett* v. *Paschall,* 61 Wash. 47, 111 Pac. 879, Ann. Cas. 1912B, 1128, 31 L. R. A. (n. s.) 827), but the general and safer rule is that, in cases of anticipated danger, "equity will not interfere, unless its right to do so is free from doubt"; in other words, "it must be shown (a) that the proposed construction or the use to be made of property will be a nuisance *per se;* (b) or that, while it may not amount to a nuisance *per se,* under the circumstances of the case a nuisance must necessarily result from the contemplated act or thing. * * * The injury must be actually threatened, not merely anticipated; it must be practically certain, not merely probable. It must further be shown that the threatened injury will be an irreparable one which cannot be compensated by damages in an action at law." (*Pennsylvania Co.* v. *Sun Co.,* 290 Pa. 404, 138 Atl. 909, 910, 55 A. L. R. 873.) The statement is in accord with the general rule announced by the text-writers and the cases cited in support thereof. (Joyce, Law of Nuisances, 592; 1 High on Injunction, 4th ed., 705; 20 R. C. L. 478; 46 C. J. 766; 55 A. L. R. 881.) Under this rule, damage by way of reduction in the market value of near-by property which the owner desires to sell, a situation shown by plaintiffs' testimony, is not sufficient to move a court of equity, as such injury may be readily compensated by damages in an action at law.

The plaintiffs complain that the court's findings do not take ▮ into consideration that they were appearing, not only personally, but as representatives of the general public. The find-

ings as to the noninjurious effect of the erection of the structure upon plaintiffs apply with equal force to all members of the public similarly situated. If the plaintiffs are not entitled to an injunction in their private capacity, they are not entitled to it as members of a class, as the record discloses no evidence of apprehended danger to the public at large which would not apply with equal, or greater, force to these plaintiffs.

Counsel for plaintiffs contend that the erection of the plant ▮ on the proposed site violates the prohibitions found in Chapter 212 of Part III of the Codes (sec. 2786 et seq., Rev. Codes 1921), regulating the manufacture, storing, sale and transportation of ''explosives''; but it is clear from a reading of the provisions relied upon that the legislature did not intend to include gasoline or other products of crude oil in its definition of ''explosives''; otherwise gasoline filling stations and storage tanks would come under the ban, and it is doubtful whether we would be permitted to drive automobiles and trucks within the city ▮ limits. In interpreting a statute, the legislative intent must govern. (*Wibaux Imp. Co.* v. *Breitenfeldt,* 67 Mont. 206, 215 Pac. 222; *Sullivan* v. *City of Butte,* 65 Mont. 495, 211 Pac. 301.)

The court's conclusions of law, as well as its findings of fact, disclose no substantial error committed, and, the court having exercised its sound legal discretion in favor of the defendants, the judgment must be affirmed.

Associate Justices Stewart, Anderson and Morris concur.

Mr. Chief Justice Sands, absent on account of illness, takes no part in the foregoing decision.