**COMMERCE OIL REFINING CORP.,**
Plaintiff, Appellant,

v.

**William W. MINER et al., Defendants,**
Appellees.

No. 5475.

United States Court of Appeals
First Circuit.

June 16, 1960.

Andrew P. Quinn, Providence, R. I., and Stephen P. Duggan, Jr., New York City, with whom Daniel J. Murray, A. Peter Quinn, Jr., Providence, R. I., Richard Hawkins, William J. Manning, Donald Oresman, New York City, Letts & Quinn, Providence, R. I., and Simpson, Thacher & Bartlett, New York City, were on brief, for appellant.

Salvatore L. Virgadamo, Newport, R. I., with whom Cornelius C. Moore, Newport, R. I., James A. Higgins, Providence, R. I., Francis J. Boyle, Newport, R. I., William C. Dorgan and Charles H. Drummey, Providence, R. I., were on brief, for appellees.

Roberts & Coffey, Dennis J. Roberts, Providence, R. I., amicus curiae for Town of Jamestown, Rhode Island.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

Commerce Oil Refining Corporation, Commerce hereinafter, a Delaware corporation, filed a complaint in two counts. in the court below against seventeen named defendants, all citizens of Rhode Island, as individuals, and nine of them as officers and directors of the Jamestown Protective Association. Commerce alleged in its first count that it had a license from the Town of Jamestown to erect and operate an oil refinery in an area of the town zoned for such use and that the defendants "unlawfully combined and conspired to harass, delay and prevent plaintiff from exercising its right to construct and operate" its refinery and that to effectuate their "unlawful combination and conspiracy" the defendants "formed and used an organization designated as Jamestown Protective Association as part of said unlawful combination and conspiracy." On this count the plaintiff asked that the defendants be enjoined from harassing the plaintiff by suit in the court below or in any Rhode Island court or by any other means and for an award of damages against each defendant in the amount of $500,000 plus costs and exemplary or punitive damages. In its second count, repeating the allegations of count one, the plaintiff asserted a cause of action under the Sherman Anti-Trust Act, as amended, 15 U.S.C.A. § 1 et seq.,[1] and asked for injunctive relief and an award of treble damages against each defendant in the amount of $1,500,000 plus costs and a reasonable attorney's fee.

The defendants answered denying the basic allegations of the complaint, including the validity of the plaintiff's license, and counterclaimed alleging that the plaintiff's refinery when constructed and put into operation would constitute a continuing nuisance causing them great and irreparable harm. Wherefore they asked that a local safety ordinance regulating the construction of oil refineries and the license issued to the plaintiff thereunder be declared null and void. The counterclaim further prayed that the amendment to the zoning ordinance of the Town of Jamestown permitting the construction of oil refineries in a defined area of the town and also an amendment to the local building ordinance which exempted oil refineries from the requirements of that ordinance be declared null and void and that the plaintiff be enjoined from taking any action or doing any act purporting to be authorized by its license and the amendments.

After lengthy preliminary proceedings the case came on for trial before the court below sitting without a jury at the outset of which counsel for the plaintiff announced that no evidence would be offered in support of its claim of an illegal conspiracy. On the defendants' motion the plaintiff's complaint was thereupon dismissed with prejudice and the trial proceeded on the defendants' counterclaim. More than forty days of trial produced a record consisting of thousands of pages of testimony and hundreds of exhibits a great deal of both being highly technical in nature. As a result the court below concluded (1) that the

---

1. 26 Stat. 209, as amended.

amendment of the town zoning ordinance and the safety ordinance and license issued pursuant thereto, were invalid because of the failure of the Town Council to comply with the statutory procedural requirements for enacting ordinances of the kind involved, (2) that the amendment to the local building ordinance could not be sustained as being within the lawful exercise of the police power of the municipality and was therefore invalid, and (3) that the plaintiff's proposed refinery when put into operation would constitute a nuisance. On the latter point it said:

> "After a careful consideration of all the testimony and the reasonable inferences to be drawn therefrom, and recognizing the right of the plaintiff to make a reasonable use of its lands, I am satisfied that the operation of said refinery in the manner and at the location proposed by the plaintiff will cause a substantial diminution both in the values of the defendants' properties and in their enjoyment thereof as measured by the degree of comfort which the average man living in such a locality has the right to expect. It follows that said use will be unreasonable and hence a nuisance to the defendants against which they are entitled to injunctive relief."

Commerce has taken this appeal from the judgment entered by the court below in conformity with its opinion wherein it declared the Jamestown ordinances and the plaintiff's license invalid and, with costs to the appellees, permanently enjoined Commerce from proceeding with the erection of its refinery.

In our view there was no occasion for the court below, and there is no occasion for us, to pass upon the validity of the local ordinances and hence of the plaintiff's license, for it is the generally accepted rule that " * * * the validity or constitutionality of an ordinance is not an issue before a court, and the court need not pass upon it, * * * where the determination of it is not necessary to a proper disposition of the case * * *." 6 McQuillin, Municipal Corporations, § 20.10 (3d ed. 1949).

The plaintiff's license was issued pursuant to a local ordinance enacted by the Town Council under the authority conferred by Section 21 of Chapter 333 of the General Laws of Rhode Island, Revision of 1938, upon town and city councils to make and ordain all ordinances and regulations for their towns or cities "which they may deem necessary for the safety of their inhabitants from the manufacture, processing, storage, keeping, having in possession, transportation, sale or use of * * * [crude petroleum], gasoline, kerosene, heating fuels, lubricating oils and greases, allied petroleum products, and any and all other explosives, explosive chemicals and inflammable substances * * *." Obviously this enabling act authorizes local regulation of the handling of the substances named therein in order to provide protection from fire or explosion. There is nothing in it authorizing local governments to regulate air pollution. Indeed, authority for local regulation in that respect was conferred at the time the local ordinance was adopted by a different enabling act. Chapter 1760 of the Rhode Island Acts and Resolves, Jan.Sess. (1946), now General Laws of R. I. (1956) §§ 23–25–21 et seq. Nor is there anything in the amendment to the safety ordinance or the license issued thereunder relating to air pollution. The local regulation purports to extend and extends only to risks of fire and explosion. But, the District Court did not base its finding that the plaintiff's refinery when constructed would constitute a private nuisance because of any such danger. On the contrary, it found as a matter of common knowledge that although an oil refinery was a potential source of danger from fire or explosion unless properly constructed, such dangers could "be substantially lessened if not entirely eliminated by the imposition of proper restrictions and safeguards relating to its construction." [170 F.Supp. 402]

■ Clearly the District Court's finding of anticipatory nuisance rested upon subsidiary findings that the refinery when in operation would pollute the air with noisesome and noxious gases, matters not covered in the amendment to the local ordinance or the license issued under it. Thus, even if we should assume arguendo that a license would be a defense, the present license would not be, for the alleged nuisance does not arise from the explosive or inflammable nature of the substances stored or the processes carried out on the premises, but from the deleterious, unpleasant and noxious effects of the gases which are the by-products of the refinery process. In this situation the license is of no consequence as pointed out in Commonwealth v. Kidder, 1871, 107 Mass. 188, 193, wherein, considering an indictment laid against an oil refinery constructed in accordance with statutory safety requirements as a common law nuisance because it polluted the air, the court said:

"These enactments are manifestly intended to protect the public against dangers arising from the explosive and inflammable nature of petroleum; and, having regulated the whole subject in that aspect, they might well be deemed to protect any establishment, guarded as they direct, from indictment as a nuisance on account of such dangers only. But they contain no provisions for preventing the spread of unwholesome and offensive odors in the course of the manufacture; and if the defendants' position were sustained, the result would be that no limit would be put to such manufacture in the most crowded and populous portions of any town or city. The reasonable, if not the necessary, inference is, that it was not the intention of the legislature to establish a new rule in this regard, but to leave the question whether the manufacture is carried on at such places and in such a manner as to be unwholesome and offensive to the public, and on that account indictable as a nuisance, to be determined by the rules of the common law."

■ Moreover, in spite of the minority view prevailing, apparently, in Massachusetts, see Strachan v. Beacon Oil Co., 1925, 251 Mass. 479, 146 N.E. 787, we would infer from State v. Barnes, 1898, 20 R.I. 525, 529, 530, 40 A. 374, that Rhode Island would follow the majority view and hold that, while a license constitutes a defense to a prosecution for maintaining a public nuisance, a governmental "grant of powers and privileges to do certain things does not carry with it any immunity for private injuries which may result directly from the exercise of those powers and privileges." Baltimore & Potomac R. R. Co. v. Fifth Baptist Church, 1883, 108 U.S. 317, 334, 2 S.Ct. 719, 27 L.Ed. 739. For citation of cases and discussion see 39 Am.Jur., Nuisances § 205 (1942); note, 52 Colum. L.Rev. 781 (1952); Prosser, Torts § 74 (2nd Ed. 1955).

■ Little needs to be said with respect to the amendment of the local zoning ordinance creating a refinery use district, for it is clearly established that compliance with a zoning ordinance does not protect a person from the consequences of making an unreasonable use of his property whereby he invades the private right of his neighbor. The matter was well stated in Weltshe v. Graf, 1948, 323 Mass. 498, 500, 82 N.E.2d 795, 796, wherein, affirming an injunction against operating a truck terminal on the edge of a zone permitting such a use but adjacent to a hotel in the zone owned by one of the plaintiffs and at the boundary of a district zoned for residences where all the plaintiffs had their homes, the court said:

" * * * The fact that the operation of certain kinds of commercial enterprises is permitted under a zoning ordinance is an important factor in determining whether the use being made of the land in conducting a particular enterprise goes beyond what is reasonable in view of the nature and character of the lo-

cality, the effect of the use upon those who live in the neighborhood, and the strength and force appropriately due to the various conflicting interests usually involved in the subject matter. But a zoning ordinance affords no protection to one who uses his land in such a manner as to constitute a private nuisance."

We think it clear from Dunham v. Westerly Zoning Board, 1942, 68 R.I. 88, 97, 26 A.2d 614, 618, that this is also the law in Rhode Island for in that case, referring to persons objecting to the erection of a power station in a zone permitting that use, the court said: " * * they will not be deprived of a suitable remedy merely because a permit under the zoning ordinance has been granted, since such a permit would not grant any right to operate a private nuisance."

There remains for consideration the amendment to the local building ordinance. Surely it could not seriously be contended that compliance by the plaintiff with the local building ordinance would afford it any protection if it used its property in such a manner as to constitute an unreasonable interference with its neighbors in the enjoyment of their property.

Since, even if valid, neither the plaintiff's license nor the amendment to the local zoning and building ordinances would provide the plaintiff with a defense to the charge of constructing a private nuisance, it follows that there was no need for the court to pass on the validity of the ordinances, for decision of that matter was unnecessary to its disposition of the case.

We now come to grips with the basic problem on this appeal. The town of Jamestown, Rhode Island, is co-extensive with the island of Conanicut in lower Narragansett Bay. The island is a little over 9 miles long and is only slightly more than a mile wide at its widest point. Its area is 9.3 square miles and its permanent population is about 2,000. A majority of the permanent population, about 75%, live in a relatively compact residential and small business district in the southerly third of the town which has a public water supply and sewer system. According to the District Court's findings: "It is primarily a residential, resort and farming area. At the present time, no industries of any sort are located thereon and there are only relatively few business enterprises, such as retail shops, stores, gasoline filling stations and hotels. It enjoys considerable popularity as a resort area during the summer."

No doubt the island has many advantages in the way of climate and scenery as a place for country living. But its popularity as a place to live does not appear to have increased very much in the last few years. As a resort it appears, if anything, to have declined. Only a few new homes have been built on the island in recent years, fewer hotels are operating than formerly and a golf course has been abandoned. It is fair to say that the island's economy is relatively static.

The island is well suited for Commerce's purpose, however, for not only is it located near the heart of industrial New England, but it also lies in the sheltered waters of Narragansett Bay and has a harbor deep enough to permit the docking of deep-draft tankers bringing crude oil from the Middle East. And it would appear that a majority of the permanent residents of the town, no doubt anticipating a source of substantial tax revenue and employment, welcomed the construction of a refinery within its borders. This is indicated by the action of the Town Council amending the local zoning ordinance, although perhaps not strictly in accordance with the required statutory procedures, to create a refinery use district. A straw vote of the inhabitants of the town, however, provides more persuasive evidence of popular sentiment. Strong feeling for and against the erection of a refinery having been expressed by various meetings held in the town, the Town Council authorized a vote of the inhabitants qualified to vote at a general election on the question:

"Are you in favor of a modern oil refinery in the northern part of the Island of Jamestown?" Of the 1020 voters checked off on the check list 777 voted "yes," 233 voted "no," and there were 10 blank or defective ballots.

The plaintiff proposes to construct its refinery on an approximately 600 acre tract of land it owns in the refinery use district created by the amendment to the zoning ordinance. That district, consisting of about 815 acres, extends across the middle of the northerly third of the island. At the time of the trial there were 16 dwellings in the district and the rest of the land therein was vacant. While a small portion of the district is swampy and overgrown with scrub, most of it, about 85%, is suitable for home sites or farming. It is not, however, being used for agricultural purposes or, indeed, for anything else. About two miles south of the district is a housing development begun about 20 years ago in which to date about 143 homes have been built, and within about one and one half miles north of the district there are 71 homes, a summer hotel and a summer camp. The center of the compact part of the town is about 2½ miles south of the district. The prevailing winds over the island are from a generally westerly direction.

There can be no doubt and indeed it is freely conceded by Commerce that substantial quantities of malodorous, and in sufficient concentration toxic, gases are generated in the process of refining crude oil, particularly "sour crudes" such as those from the Shiekdom of Kuwait which Commerce intends to process in the refinery it proposes to build in Jamestown. These gases are hydrogen sulfide ($H_2S$) and a group of gaseous hydrocarbons called mercaptans. Furthermore the stacks carrying the exhaust from the various heaters essential to the refinery process will discharge substantial quantities of sulfur dioxide ($SO_2$) into the atmosphere. This gas is not peculiar to the operation of a refinery but, as a product of combustion, is present in varying degrees in most smokestacks. It has the odor of burned sulfur matches, is detectable by its odor in concentrations of 2.5 parts per million parts of air by volume and on constant exposure is deleterious to health in concentrations of 5 or more parts per million of air by volume.

We turn our attention first to hydrogen sulfide and mercaptans. In accordance with general commercial practice about 1% of the sulfur in the crude oils Commerce proposes to refine will be removed in the form of hydrogen sulfide prior to shipment from the Middle East by a process known as stabilization. More of the sulfur will be converted in the course of the refining process into hydrogen sulfide and the residue will remain in the final products of the refinery. The hydrogen sulfide given off by the crude oil during the refining process will, according to Commerce's plan, be converted into odorless, elemental sulfur by a process which is about 96% efficient. The remaining hydrogen sulfide will be incinerated and discharged into the air as sulfur dioxide.

Mercaptans are produced at various stages of the refinery process. In Commerce's operation some will be converted into hydrogen sulfide, which will be treated as described above, others will be removed by a caustic wash treatment and incinerated and some will be converted into hydrocarbons and form part of the gasoline and heating oils produced.

Commerce proposes a system which is completely enclosed from the tanker at the dock to the storage tanks for the finished products. When functioning properly any of the above gases not converted into elemental sulfur will be incinerated and discharged into the atmosphere as sulfur dioxide. There is no dispute that theoretically the proposed refinery would be practically 100% effective in preventing the escape of hydrogen sulfide or mercaptans into the atmosphere. In case of accident, however, there is no doubt that these gases might escape into the air and should that occur be blown by the wind not only out of the refinery area but also out of the refinery

use district altogether. The real dispute as to these gases lies in the probability of the occurrence of accidents resulting in a discharge of the gases onto the defendants' properties.

Accidents in refineries as elsewhere are, of course, inevitable. And there can be no doubt that in the event of a serious accident these malodorous and toxic gases might escape and be blown onto the defendants' properties if at the time the wind happened to be blowing in their direction. But the evidence is undisputed that in a modern, well designed and well built refinery accidents allowing the escape of these gases could be minimized, one expert witness indicated practically to the vanishing point, by "good housekeeping," meaning by that, frequent and thorough inspections of the equipment, keeping the premises neat and clean, and employing skillful and competent supervisory and operating personnel. No witness, of course, could say how frequently accidents permitting the escape of these gases in substantial quantity would be likely to occur.

The District Court, however, found that the "most that can be said" for the "devices and procedures" proposed by Commerce "is that they will be nearly completely effective under the most ideal conditions." Then, noting the highly corrosive qualities of Kuwait crude oil and the volume to be processed each day, it said that it was "satisfied that varying quantities of these [referring to hydrogen sulfide and mercaptans] obnoxious gases will find their way into the atmosphere at all times when the refinery is in operation. To assume that they will not be carried by the prevailing winds beyond the relatively small area upon which a refinery of the size contemplated is to be located would be far from realistic. On the contrary, the credible testimony in this case establishes that said gases will be carried by the prevailing winds at all times to the properties of some of the defendants, and, because of their extremely disagreeable odors in very low concentrations and their cumulative effect, they will seriously diminish both the value of the defendants' lands as residential properties and the enjoyment thereof."

The finding that there will be a continuous discharge of these gases onto the properties of some of the defendants is not supported by the evidence. For the evidence is undisputed that the malodorous gases to which the court was referring will escape into the atmosphere only in the event of some accident and there was no testimony, as indeed there could be none, as to the probable frequency of accidents in the proposed refinery resulting in the escape of these gases. Furthermore, assuming that accidents resulting in the discharge of these gases will occur in or near the center of Commerce's processing area, it is clear that if the wind at the time were blowing from any direction between northeast and south, the gases would not be carried onto the property of any defendant but out over the waters of the bay.

Sulfur dioxide, and what is referred to as general refinery odors, as contaminants of the atmosphere remain to be considered.

Little needs to be said as to the latter. It is an odor produced by a combination of the odors of hydrogen sulfide, mercaptans and the general hydrocarbon odor often encountered at gasoline filling stations. Since there is no dispute that Commerce's plans calls for a completely enclosed system, this odor due to its composition would be present only in the event of an accident. Having already pointed out that the frequency of accidents is conjectural, it is enough to add that the testimony is convincing that any general refinery odor remaining after an accident could be quickly eliminated by prompt and thorough cleaning of the area affected. It will suffice to say that our previous discussion applies equally here and that further comments are superfluous.

Sulfur dioxide is another matter, for there is no doubt that this gas will be continuously produced in substantial quantities and the only means proposed

for disposing of it is to discharge it into the atmosphere through stacks of varying heights. We are not concerned, however, with the amount of this gas in the upper air. Our concern is with the concentrations of it on the ground likely to be encountered on the properties of the defendants.

There was no expert testimony that, in view of the height of the proposed stacks and other pertinent factors, there would ever be a ground concentration of this gas on any defendant's property of as much as 5 parts per million parts of air by volume and hence enough to have an adverse effect on health. The court found, however, that there would be enough ground concentration of the gas on the defendants' properties to be perceptible. It said:

> "The credible testimony satisfies me that, depending upon atmospheric conditions, wind velocities, and the prevailing winds, as shown by the evidence of past annual weather conditions on the Island of Jamestown, there will be frequent concentrations of $SO_2$ on the property of the defendant Froberg in excess of 2.5 parts per million, and that it is reasonable to conclude that the properties of the other defendants will be frequently visited with similar concentrations carried to the premises by the prevailing winds and that these concentrations will serve to effect a substantial diminution in the values of their properties and in the enjoyment thereof."
> [170 F.Supp. 410]

In reaching this conclusion the court specifically rejected the testimony of one expert witness with impressive qualifications by training and experience in problems of air pollution caused by refineries who had said that in his opinion the ground concentration of $SO_2$ beyond the nearest boundary line of the defendant nearest to the refinery, Froberg, would not exceed 0.4 parts per million even under the most unfavorable conditions. *Sub silentio* it also rejected testimony in similar vein of several other expert witnesses. The court's finding, however, has some foundation in the testimony of three experts. One of these speaking on the basis of experience said: "From a high sulfur crude and under atmospheric conditions of steady but not high velocity wind in the direction of the wind to leave the refinery I am sure that you can detect $SO_2$ by its irritating effect on the eyes, the nose and the throat at a distance of two or three miles. That might not happen every day, but it will happen some of the time." Another testified in somewhat the same vein although he indicated that $SO_2$ could be detected at a distance only by its odor and not by its irritating effect. But this witness when employed as an expert by the Town Council prior to this litigation gave as his opinion that: "Pollution by sulfur dioxide from refinery operation is seldom objectionable if limited to the concentrations resulting from burning fuel oil and the malodorous mercaptans separated in refining operations * * *. Many law suits have resulted from the discharge of sulfur dioxide into the air by smelters on account of the damage to vegetation but not from oil refinery practice." The other witness on whom the court must have relied for its finding testified on the basis of a formula, a basis other experts, including some of the appellees', rejected as wholly inadequate, one went so far as to characterize it as "cockeyed," for the reason that no formula could take matters of topography into account. Moreover, the formula used by this witness was not one generally accepted in the art but the witness' own simplification of such a formula. Whatever the value of the witness' formula may be, however, according to it Commerce's refinery would produce concentrations of $SO_2$ on the property of the defendant nearest to it of over 2.5 parts per million only when the wind was blowing in that direction at 1 mile per hour. At zero wind velocity the result produced by the formula is admittedly absurd. At a wind velocity of 2 miles per hour the concentrations of the gas on the property nearest the refinery would drop below 2 parts

per million and as the wind velocity increased the concentrations would decrease. Moreover, there is no specific evidence of the frequency of 1 mile per hour winds over Jamestown in any direction, since the data used by the expert witness who testified on this phase of the case listed all winds of less than 3 miles per hour as calm. However, computations based on this witness' testimony show that winds blow from the refinery toward the Froberg property about one twelfth of the time, and, assuming that the wind was blowing at 1 mile per hour one third of the time the wind was listed as calm, calculations show that accepting the results of the formula there would be detectable concentrations of $SO_2$ on the Froberg property only for about one hour in every 720 hours, or for somewhat less than one hour in every period of four weeks.[2]

With the evidence as summarized above and the findings of the District Court in mind, we now turn to the applicable law, which, of course, is the law of Rhode Island.

■ We may take it for granted that a home owner does not enjoy the absolute right to keep his neighborhood forever residential in character. Lord Justice James in Salvin v. North Brancepeth Coal Co., L.R. 9 Ch.App. 705, 709 (1874), colorfully expressed this general rule in the statement: "If some picturesque haven opens its arms to invite the commerce of the world, it is not for this court to forbid the embrace, although the fruit of it should be the sights, and sounds, and smells of a common seaport and ship-building town, which would drive the Dryads and their masters from their ancient solitudes." See also Pennsylvania Co. for Insurance on Lives and Granting Annuities v. Sun Co., 1927, 290 Pa. 404, 409, 138 A. 909, 910, 55 A.L.R.

873, a leading case cited and relied upon on another point in Seidner, Inc. v. Ralston Purina Co., 1942, 67 R.I. 436, 24 A.2d 902, to be considered in detail presently, wherein the Supreme Court of Pennsylvania said:

"In this age, persons living in a community or neighborhood must subject their personal comfort to the commercial necessities of carrying on trade and business. Where the individual is affected only in his tastes, his personal comfort, or pleasure, or preferences, these he must surrender for the comfort and preferences of the many."

■ No one, however, is required to submit to his neighbor's unreasonable use of his property. The Supreme Court of Rhode Island in Blomen v. N. Barstow Co., 1913, 35 R.I. 198, 211, 85 A. 924, 928, 44 L.R.A.,N.S., 236, in considering a bill in equity by residence owners to enjoin the operation of a drop hammer in their neighborhood which made a loud thumping noise and jarred their premises, summed up its conclusion drawn from an analysis of many cases from other jurisdictions in the statement:

"The rule of law is well settled that every person is bound to use his property so as not to injure that of another, or interfere with the reasonable and proper enjoyment thereof; and that the carrying on of a business, which creates noisome smells, or noxious vapors, or causes great and disturbing noises, jarrings or vibrations, which affect injuriously property in the vicinity or render the occupation thereof inconvenient and uncomfortable, is a nuisance for which a person whose property is damaged or whose health is injured or whose reasonable enjoyment of his estate as a place of residence is

---

**2.** The court below mentioned but did not pass upon the defendants' contentions that the proposed refinery would be a nuisance in other respects, such as by the glow from its flare, its illumination at night, dust from its catalytic cracking unit, smoke from its stacks and its pol-

lution of the waters of the bay. We see no reason to consider these contentions either, for the evidence is quite inadequate to show that the refinery would constitute a nuisance in any of these respects.

impaired or destroyed thereby, may maintain an action to recover compensation for the injury, and that in such case a court of equity will restrain the continuance of the nuisance by injunction."

■ But, to secure an injunction against a neighbor's prospective use of his property, more must be shown than the mere possibility or even probability of harm resulting from that use. Unless a proposed use will be a nuisance *per se,* which is not suggested here for it is generally held that refineries are not in that category, see Purcell v. Davis, 1935, 100 Mont. 480, 50 P.2d 255, courts of equity do not readily grant injunctions to restrain anticipatory nuisances. The rule in Rhode Island is to be found in the Seidner case cited above wherein the court at page 451 of 67 R.I., at page 909 of 24 A.2d quoted City of Lynchburg v. Peters, 1926, 145 Va. 1, 133 S.E. 674, as follows:

> "It is a well-established principle of equity jurisprudence that when a proposed structure or the use of it, is not a nuisance *per se,* a court of equity will not grant an injunction against the erection of the structure or the use, merely because it may become a nuisance. The alleged nuisance must be the necessary result or the court will await the actual results."

The Rhode Island court then went on to say in its own words:

> "We are of the opinion that to justify an injunction, in a cause of the character of the instant one [i. e. a suit to enjoin a prospective nuisance], the evidence must show clearly and convincingly that substantial damage to the complainant's property or business will be practically certain to result from the operation by the respondent of the business against which an injunction is sought."

To give the words of comparison used by the Supreme Court of Rhode Island ("clearly," "convincingly" and "practically certain"), the meaning the court intended them to convey we must look to the application of the Rhode Island rule in the case in which the words were used. We turn therefore to consideration of the Seidner case in some detail.

The plaintiff Otto Seidner, Inc., at the time of suit and for many years before had operated a mayonnaise factory in a predominantly industrial section of the town of Westerly, Rhode Island. The defendant, as the lessee of adjoining land, proposed to construct a coal yard into which coal would be dumped from railroad cars standing on a siding. The plaintiff's bill in equity sought to enjoin the construction of the coal yard on the ground that coal dust would necessarily be carried by the wind into its mayonnaise factory contaminating its product thereby and preventing it from carrying on its business to its irreparable injury. It was not disputed that the proposed location of the coal bins was only 75 feet from the nearest corner of the plaintiff's building and certainly there can be no doubt that coal dust in mayonnaise would, to say the least, adversely affect its saleability.

At the trial an expert witness with many years' experience in the coal business, called by the plaintiff, testified that he did not see how coal dust could possibly be prevented under certain conditions of wind from getting into the plaintiff's factory even with the precautions in the way of canvas covers during the unloading process which the defendant proposed to take. An expert called by the defendant testified that although there would be dust from the defendant's yard there would be no appreciable amount in view of the covers the defendant proposed to use and that in any event unless there was a high wind the dust would not travel over 100 feet.

On the basis of this testimony the trial court granted the injunction prayed for, saying:

> "Considering the testimony of both experts together with the other convincing evidence in the case, it

appears to us to be clearly and convincingly proved that the operation of the proposed coal bins without some dust escaping is absolutely impossible."

Expressing doubt as to the efficacy of the precautionary measures the defendant proposed to take to prevent the escape of coal dust, the court then went on to say:

"We are satisfied that even with the canvas covering, coal dust of appreciable density and quantity will escape, which, carried by a westerly wind, will be blown into complainant's plant and especially into the mixing room, working great havoc to the food products, both completed and in process. The coal dust will also settle into and onto the glassware, making necessary a hand-washing the cost of which, as opposed to machine washing, would put the complainant in the dilemma where it could not hope successfully to cope with competition. Irreparable injury to complainant must certainly follow."

Nevertheless, in spite of those findings the Supreme Court of Rhode Island reversed. Applying the applicable rule as quoted herein above the court said at page 451 of 67 R.I., at page 910 of 24 A.2d:

"We have carefully considered the relevant evidence in this cause, being almost entirely opinion evidence, on the question whether substantial damage to the complainant will be practically certain to result from the operation by the respondent of its proposed business, in the place and in the manner in which the respondent intends to operate it; and we are of the opinion that it has not been proved by clear and convincing evidence that such damage will be practically certain to result."

It is true that in Seidner the court was concerned with an attempt to enjoin a dusty business in an industrial area whereas here we are concerned with an attempt to enjoin a stack industry, so-called, in a residential, resort and agricultural area. Nevertheless, in the exercise of our appellate duty [3] to examine the defendants' evidence to see whether it meets the high standard of proof required by the Rhode Island law as stated and applied in the Seidner case, we feel constrained to hold that the court below erred in enjoining erection of the plaintiff's refinery as a prospective nuisance. Standing in the shoes of the Supreme Court of Rhode Island, that is to say, applying the Rhode Island rule to the evidence and the findings in this case as we believe the Rhode Island court would apply its rule, it seems to us from the Seidner case that the Supreme Court of Rhode Island would not sanction enjoining the erection of the plaintiff's refinery in Jamestown. Instead, on the relatively even balance of the sharply conflicting expert testimony in the record before us, we think the Supreme Court of Rhode Island would wait to see whether the refinery constituted a nuisance when put into operation.

The judgment of the District Court is set aside and the case is remanded to that Court for the entry of a judgment dismissing the defendants' counterclaims, but without costs in this Court.

3. See *Brenci v. United States*, 1 Cir., 1949, 175 F.2d 90, 92.